2 U.S. 370
 28 F.Cas. 377
 2 Dall. 370
 1 L.Ed. 419
 The United States
v.
Villato
 Circuit Court, Pennsylvania District
 April Term, 1797
 
 1
 The defendant had been committed by the District Judge, on a charge of High Treason against the United States, and on the return to a Habeas Corpus, issued under the act of Pennsylvania (2 Vol. Dall. Edit. p. ) it appeared, that he had entered on board of a French privateer 'in parts out of the territory of the United States, and that, having so entered, he aided in capturing an American vessel.'
 
 
 2
 But it was objected, by Dallas and Du Ponceau, for the prisoner, that he was not liable to a charge of High Treason; because he was by birth a Spaniard, and had never become a naturalized citizen of the United States. They contended, therefore, that he ought to be discharged from the prosecution: independent of any inquiry, whether the offence could be deemed High Treason, even in a citizen.
 
 
 3
 The facts were these: Francis Villato was born within the dominions of the King of Spain; he came from New Orleans to Philadelphia in the beginning of the year 1793, and, on the 11th of May following, he took and subscribed, before the Mayor of the City, the oath specified in the third section of the act of Assembly, passed on the 13th of March 1789. 2 Vol. Dall. Edit. p. 676. He afterwards went to the West Indies, entered on board a French privateer, and acted as prize-master of the American brig John of New York, which the privateer had taken, while he was on board, and procured to be libelled and condemned at Cape Francois.
 
 
 4
 Under these circumstances, the argument entirely turned upon the question; whether the prisoner had become a citizen of the United States, in consequence of the oath taken and subscribed by him, on the 11th of May 1793.
 
 
 5
 For the affirmative of the proposition, Lee, the Attorney General of the United States, and Morgan, contended, that the act of Pennsylvania was in force in the year 1793; that it was not affected by the establishment of the new State Constitution, nor repealed by any subsequent law; that the power of naturalization granted to the Federal government was concurrent with, and not exclusive of, the State jurisdiction upon the subject; that the first naturalization act of Congress passed in the year 1790, furnished a new rule, but contained no repealing, or negative, words, to impair the operation of the pre-existing State laws; and that although at this time there was no other than the Federal rule for naturalizing a foreigner, yet this was the direct effect of positive negative words, in the act of Congress passed in the year 1795. 3 Vol. Swift's Edit. p. 163. Collet v. Collet. Ant. p. 295. Dallas, in reply. It is conceded, that if the prisoner is not a naturalized citizen of the United States, he must be discharged. It is unnecessary to enquire, whether the Federal power of naturalization is concurrent, or exclusive; since, it will be sufficiently shewn, that even if the power is concurrent, the State had ceased to exercise it before the year 1793; and, consequently, the prisoner could not have become a citizen of the United States under any law of Pennsylvania. Before Congress had exercised the power of naturalization given by the Federal Constitution, the then existing State constitution had declared, that 'every foreigner of good character, who comes to settle in this State, having first taken an oath or affirmation of allegiance to the same, may purchase, or by other just means acquire, hold, and transfer, land, or other real estate; and, after one year's residence, shall be deemed a free denizen thereof, and entitled to all the rights of a natural born subject of this State, except that he shall not be capable of being elected a Representative until after two years residence.' 1 Vol. Dall. Edit. p. 60. in Appendix. While the test laws were in force, no particular form of qualification was prescribed for the purpose of naturalization, different from the oath, or affirmation, of allegiance and abjuration, exacted from every inhabitant of the State: But when the test laws were repealed, and before Congress had legislated upon the subject, a special provision became necessary; and the proviso in the act of the year 1789 (2 Vol. Dall. Edit. p. 677.) was expressly introduced to preserve and effectuate the 42nd section of the Constitution, with which it is in language and meaning inseparably connected. The next change in the business of naturalization was the act of Congress, passed in the year 1790. This act, it is true, does not contain a repeal of the State law, nor any negation of a State power to naturalize; but the arguments ab inconvenienti are strong against a concurrent authority; and, if not on the question of power, at least on the principle of expediency, the State Convention, who afterwards formed our existing Constitution, have evidently avoided a collision of jurisdiction, by omitting to prescribe any State mode of naturalization, and leaving the subject, implicity, to the rules which Congress had previously prescribed. A citizen of the United States, adopted under the act of Congress, is a citizen of each and every State; and the convention of Pennsylvania could conceive no means of establishing uniformity (the very object contemplated by the Federal Constitution) if each State, in a distinct and different mode, might, likewise, convert the character of an alien, into that of a citizen of the United States. The State Constitution is, therefore, silent; and it only remains to be shewn, that the law passed in the year 1789, was virtually repealed by the ratification of that Constitution; which provides, indeed, that all the pre-existing laws, not inconsistent with itself, shall continue in force. Schedule sect. 1. But the act of 1789 was not only entirely dependent on the existence of the old Constitution, which was abrogated; but is in many essential points inconsistent with the new Constitution. Thus, it is to be remarked, that the part of the act of Assembly on which the controversy turns, is not a substantive and original section, but a mere declaratory proviso, that the Legislature did not intend to do, what it was out of their power to have done, that is, to alter the 42nd section of the Constitution by a mere repeal of the test laws. The proviso proceeds in the following words: 'every such foreigner as in the said section mentioned, who shall come to settle in this State, shall, after one year's residence therein, be entitled to the full enjoyment of the rights and privileges therein specified,' upon taking and subscribing the oath, or affirmation, &c. When the whole Constitution was destroyed, none of its parts could survive; and when, therefore, the 42nd section was annulled, the description of foreigners which it contained, and the rights and privileges which it specified, could no longer furnish a foundation, on which the act of Assembly could stand, and it inevitably shared the fate of every baseless superstructure. But is it possible to render the act consistent with the existing constitution? A slight comparison will yield a satisfactory answer. The act declares, that a foreigner, having taken the oath, or affirmation, of allegiance, and resided here one year, shall be entitled to all the rights and privileges specified in the 42nd section of the old consti ution; that is, he may acquire, hold, and transfer real estate, and enjoy all the rights of a natural born subject of this state, except the right of being elected a representative, which he cannot enjoy for two years. Now, the existing constitution will not allow any man to be even an elector, who has not resided here two years; and besides requiring a longer period of residence than two years, to entitle a citizen to be elected a representative, a senator, or governor, it superadds the qualification, that he shall be of a certain age, before he can be chosen for those offices respectively. If, then, the act of assembly is in force, an alien naturalized under it, having the rights of the old, is in a situation preferable to a natural born citizen under the accumulative restraints of the new constitution. But a contrary construction has been given whenever the point was directly presented for consideration (which was not the case in Collet v. Collet) by the legislature, by our courts, and by the bar.
 
 
 6
 Peters, Justice.
 
 
 7
 At the time of committing the defendant, some doubts arose in my mind; which, on account of the importance of the subject, I thought it more proper to submit to a solemn discussion, than hastily to decide at my chambers. I take the earliest opportunity, however, to acknowledge, that I am now convinced the commitment was erroneous. The act of assembly is obviously inconsistent with the existing constitution of the state; and, therefore, cannot be saved by the general provision of the schedule annexed to it. On that ground only my opinion is formed; but it is sufficient to authorise a declaration, that the proceeding before the Mayor was, ipso facto, void; that, the prisoner is not a citizen of the United States; and that, consequently, he must be released from the charge of High-Treason.
 
 
 8
 Iredell, Justice.
 
 
 9
 I am of the same opinion. Difficulties, it is true, have been suggested on points not necessary to a decision on the present occasion; and, certainly, if the question had not previously occurred, I should be disposed to think, that the power of naturalization operated exclusively, as soon as it was exercised by Congress.
 
 
 10
 But the circumstances of the case now before the court, render it unnecessary to enquire into the relative jurisdictions of the State and Federal governments. The only act of naturalization suggested, depends upon the existence, or non-existence, of a law of Pennsylvania; and it is plain, that upon the abolition of the old constitution of the state, the law became inconsistent with the provisions of the new constitution, and, of course, ceased to exist, long before the supposed act of naturalization was performed.
 
 
 11
 The Prisoner must, therefore, be discharged.