# IMMIGRATION AND NATURALIZATION SERVICE v. ST. CYR

No. 00–767.   Argued April 24, 2001—Decided June 25, 2001

290

STEVENS, J., delivered the opinion of the Court, in which KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. O'CONNOR, J., filed a dissenting opinion, *post*, p. 326. SCALIA, J., filed a dissenting opinion, in

which REHNQUIST, C. J., and THOMAS, J., joined, and in which O'CONNOR, J., joined as to Parts I and III, *post*, p. 326.

*Deputy Solicitor General Kneedler* argued the cause for petitioner. With him on the briefs were *Acting Solicitor General Underwood, Acting Assistant Attorney General Schiffer, Paul R. Q. Wolfson, Stephen C. Robinson, Donald E. Keener, Alison R. Drucker, Ernesto H. Molina,* and *James K. Filan, Jr.*

*Lucas Guttentag* argued the cause for respondent. With him on the brief were *Lee Gelernt, Judy Rabinovitz, Steven R. Shapiro, Jayashri Srikantiah, Michael G. Moore,* and *Paul A. Engelmayer.**

JUSTICE STEVENS delivered the opinion of the Court.

Both the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), enacted on April 24, 1996, 110 Stat. 1214, and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), enacted on September 30, 1996, 110 Stat. 3009–546, contain comprehensive amendments to the Immigration and Nationality Act (INA), 66 Stat. 163, as amended, 8 U. S. C. § 1101 *et seq.* This case raises two important questions about the impact of those amendments. The first question is a procedural one, concerning the effect of those amendments on the availability of habeas corpus jurisdiction under 28 U. S. C. § 2241. The second question is a substantive one, concerning the impact of the amendments on conduct that occurred before

---

*Daniel J. Popeo* and *R. Shawn Gunnarson* filed a brief for the Washington Legal Foundation as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the Florida Immigrant Advocacy Center et al. by *Rebecca Sharpless;* and for the National Association of Criminal Defense Lawyers et al. by *Manuel D. Vargas* and *Joshua L. Dratel.*

*James Oldham, Michael J. Wishnie,* and *Douglas W. Baruch* filed a brief for Legal Historians as *amici curiae.*

their enactment and on the availability of discretionary relief from deportation.

Respondent, Enrico St. Cyr, is a citizen of Haiti who was admitted to the United States as a lawful permanent resident in 1986. Ten years later, on March 8, 1996, he pleaded guilty in a state court to a charge of selling a controlled substance in violation of Connecticut law. That conviction made him deportable. Under pre-AEDPA law applicable at the time of his conviction, St. Cyr would have been eligible for a waiver of deportation at the discretion of the Attorney General. However, removal proceedings against him were not commenced until April 10, 1997, after both AEDPA and IIRIRA became effective, and, as the Attorney General interprets those statutes, he no longer has discretion to grant such a waiver.

In his habeas corpus petition, respondent has alleged that the restrictions on discretionary relief from deportation contained in the 1996 statutes do not apply to removal proceedings brought against an alien who pleaded guilty to a deportable crime before their enactment. The District Court accepted jurisdiction of his application and agreed with his submission. In accord with the decisions of four other Circuits, the Court of Appeals for the Second Circuit affirmed.[1] 229 F. 3d 406 (2000). The importance of both questions warranted our grant of certiorari. 531 U. S. 1107 (2001).

I

The character of the pre-AEDPA and pre-IIRIRA law that gave the Attorney General discretion to waive deportation in certain cases is relevant to our appraisal of both the substantive and the procedural questions raised by

---

[1] See *Mahadeo* v. *Reno,* 226 F. 3d 3 (CA1 2000); *Liang* v. *INS,* 206 F. 3d 308 (CA3 2000); *Tasios* v. *Reno,* 204 F. 3d 544 (CA4 2000); *Flores-Miramontes* v. *INS,* 212 F. 3d 1133 (CA9 2000). But see *Max-George* v. *Reno,* 205 F. 3d 194 (CA5 2000); *Morales-Ramirez* v. *Reno,* 209 F. 3d 977 (CA7 2000); *Richardson* v. *Reno,* 180 F. 3d 1311 (CA11 1999).

the petition of the Immigration and Naturalization Service (INS). We shall therefore preface our discussion of those questions with an overview of the sources, history, and scope of that law.

Subject to certain exceptions, §3 of the Immigration Act of 1917 excluded from admission to the United States several classes of aliens, including, for example, those who had committed crimes "involving moral turpitude." 39 Stat. 875. The seventh exception provided "[t]hat aliens returning after a temporary absence to an unrelinquished United States domicile of seven consecutive years may be admitted in the discretion of the Secretary of Labor, and under such conditions as he may prescribe." *Id.*, at 878.[2] Although that provision applied literally only to exclusion proceedings, and although the deportation provisions of the statute did not contain a similar provision, the INS relied on §3 to grant relief in deportation proceedings involving aliens who had departed and returned to this country after the ground for deportation arose. See, *e. g., Matter of L,* 1 I. & N. Dec. 1, 2 (1940).[3]

Section 212 of the Immigration and Nationality Act of 1952, which replaced and roughly paralleled §3 of the 1917 Act, excluded from the United States several classes of aliens, including those convicted of offenses involving moral turpitude or the illicit traffic in narcotics. See 66 Stat. 182–187. As with the prior law, this section was subject to a proviso granting the Attorney General broad discretion to

---

[2] The INS was subsequently transferred to the Department of Justice. See *Matter of L,* 1 I. & N. Dec. 1, n. 1 (1940). As a result, the powers previously delegated to the Secretary of Labor were transferred to the Attorney General. See *id.,* at 2.

[3] The exercise of discretion was deemed a *nunc pro tunc* correction of the record of reentry. In approving of this construction, the Attorney General concluded that strictly limiting the seventh exception to exclusion proceedings would be "capricious and whimsical." *Id.,* at 5.

admit excludable aliens. See *id.*, at 187. That proviso, codified at 8 U. S. C. § 1182(c), stated:

> "Aliens lawfully admitted for permanent residence who temporarily proceeded abroad voluntarily and not under an order of deportation, and who are returning to a lawful unrelinquished domicile of seven consecutive years, may be admitted in the discretion of the Attorney General . . . ."

Like § 3 of the 1917 Act, § 212(c) was literally applicable only to exclusion proceedings, but it too has been interpreted by the Board of Immigration Appeals (BIA) to authorize any permanent resident alien with "a lawful unrelinquished domicile of seven consecutive years" to apply for a discretionary waiver from deportation. See *Matter of Silva,* 16 I. & N. Dec. 26, 30 (1976) (adopting position of *Francis* v. *INS,* 532 F. 2d 268 (CA2 1976)). If relief is granted, the deportation proceeding is terminated and the alien remains a permanent resident.

The extension of § 212(c) relief to the deportation context has had great practical importance, because deportable offenses have historically been defined broadly. For example, under the INA, aliens are deportable upon conviction for two crimes of "moral turpitude" (or for one such crime if it occurred within five years of entry into the country and resulted in a jail term of at least one year). See 8 U. S. C. §§ 1227(a)(2)(A)(i)–(ii) (1994 ed., Supp. V). In 1988, Congress further specified that an alien is deportable upon conviction for any "aggravated felony," Anti-Drug Abuse Act of 1988, 102 Stat. 4469–4470, § 1227(a)(2)(A)(iii), which was defined to include numerous offenses without regard to how long ago they were committed.[4] Thus, the class of aliens

---

[4] See 8 U. S. C. § 1101(a)(43) (1994 ed. and Supp. V). While the term has always been defined expansively, it was broadened substantially by IIRIRA. For example, as amended by that statute, the term includes all convictions for theft or burglary for which a term of imprisonment

whose continued residence in this country has depended on their eligibility for § 212(c) relief is extremely large, and not surprisingly, a substantial percentage of their applications for § 212(c) relief have been granted.[5] Consequently, in the period between 1989 and 1995 alone, § 212(c) relief was granted to over 10,000 aliens.[6]

of at least one year is imposed (as opposed to five years pre-IIRIRA), compare § 1101(a)(43)(G) (1994 ed., Supp. V) with § 1101(a)(43)(G) (1994 ed.), and all convictions involving fraud or deceit in which the loss to the victim exceeds $10,000 (as opposed to $200,000 pre-IIRIRA), compare § 1101(a)(43)(M)(i) (1994 ed., Supp. V) with § 1101(a)(43)(M)(i) (1994 ed.). In addition, the term includes any "crime of violence" resulting in a prison sentence of at least one year (as opposed to five years pre-IIRIRA), compare § 1101(a)(43)(F) (1994 ed., Supp. V) with § 1101(a)(43)(F) (1994 ed.), and that phrase is itself broadly defined. See 18 U. S. C. § 16 ("[A]n offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense").

[5] See, e. g., Rannik, The Anti-Terrorism and Effective Death Penalty Act of 1996: A Death Sentence for the 212(c) Waiver, 28 U. Miami Inter-Am. L. Rev. 123, 150, n. 80 (1996) (providing statistics indicating that 51.5% of the applications for which a final decision was reached between 1989 and 1995 were granted); see also Mattis v. Reno, 212 F. 3d 31, 33 (CA1 2000) ("[I]n the years immediately preceding the statute's passage, over half the applications were granted"); Tasios, 204 F. 3d, at 551 (same).

In developing these changes, the BIA developed criteria, comparable to common-law rules, for deciding when deportation is appropriate. Those criteria, which have been set forth in several BIA opinions, see, e. g., Matter of Marin, 16 I. & N. Dec. 581 (1978), include the seriousness of the offense, evidence of either rehabilitation or recidivism, the duration of the alien's residence, the impact of deportation on the family, the number of citizens in the family, and the character of any service in the Armed Forces.

[6] See Rannik, 28 U. Miami Inter-Am. L. Rev., at 150, n. 80. However, based on these statistics, one cannot form a reliable estimate of the number of individuals who will be affected by today's decision. Since the 1996 statutes expanded the definition of "aggravated felony" substantially—and retroactively—the number of individuals now subject to deportation absent § 212(c) relief is significantly higher than these figures would sug-

Three statutes enacted in recent years have reduced the size of the class of aliens eligible for such discretionary relief. In 1990, Congress amended § 212(c) to preclude from discretionary relief anyone convicted of an aggravated felony who had served a term of imprisonment of at least five years. § 511, 104 Stat. 5052 (amending 8 U. S. C. § 1182(c)). In 1996, in § 440(d) of AEDPA, Congress identified a broad set of offenses for which convictions would preclude such relief. See 110 Stat. 1277 (amending 8 U. S. C. § 1182(c)).[7] And finally, that same year, Congress passed IIRIRA. That statute, *inter alia*, repealed § 212(c), see § 304(b), 110 Stat. 3009–597, and replaced it with a new section that gives the Attorney General the authority to cancel removal for a narrow class of inadmissible or deportable aliens, see *id.*, at 3009–594 (creating 8 U. S. C. § 1229b (1994 ed., Supp. V)). So narrowed, that class does not include anyone previously "convicted of any aggravated felony." § 1229b(a)(3) (1994 ed., Supp. V).

In the Attorney General's opinion, these amendments have entirely withdrawn his § 212(c) authority to waive deportation for aliens previously convicted of aggravated felonies. Moreover, as a result of other amendments adopted in AEDPA and IIRIRA, the Attorney General also maintains that there is no judicial forum available to decide whether these statutes did, in fact, deprive him of the power to grant such relief. As we shall explain below, we disagree on both points. In our view, a federal court does have jurisdiction to decide the merits of the legal question, and

---

gest. In addition, the nature of the changes (bringing under the definition more minor crimes which may have been committed many years ago) suggests that an increased percentage of applicants will meet the stated criteria for § 212(c) relief.

[7] The new provision barred review for individuals ordered deported because of a conviction for an aggravated felony, for a drug conviction, for certain weapons or national security violations, and for multiple convictions involving crimes of moral turpitude. See 110 Stat. 1277.

the District Court and the Court of Appeals decided that question correctly in this case.

## II

The first question we must consider is whether the District Court retains jurisdiction under the general habeas corpus statute, 28 U. S. C. § 2241, to entertain St. Cyr's challenge. His application for a writ raises a pure question of law. He does not dispute any of the facts that establish his deportability or the conclusion that he is deportable. Nor does he contend that he would have any right to have an unfavorable exercise of the Attorney General's discretion reviewed in a judicial forum. Rather, he contests the Attorney General's conclusion that, as a matter of statutory interpretation, he is not eligible for discretionary relief.

The District Court held, and the Court of Appeals agreed, that it had jurisdiction to answer that question in a habeas corpus proceeding.[8] The INS argues, however, that four sections of the 1996 statutes—specifically, § 401(e) of AEDPA and three sections of IIRIRA (8 U. S. C. §§ 1252(a)(1), 1252(a)(2)(C), and 1252(b)(9) (1994 ed., Supp. V))—stripped the courts of jurisdiction to decide the question of law presented by respondent's habeas corpus application.

For the INS to prevail it must overcome both the strong presumption in favor of judicial review of administrative action[9] and the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction. See *Ex parte Yerger*, 8 Wall. 85, 102 (1869) ("We are not at liberty to except from [habeas corpus jurisdiction] any cases not plainly excepted by law"); *Felker* v. *Turpin*, 518 U. S. 651, 660–661 (1996) (noting that "[n]o provision of Title I

---

[8] See n. 1, *supra;* n. 33, *infra.*

[9] See, *e. g., Bowen* v. *Michigan Academy of Family Physicians,* 476 U. S. 667, 670 (1986); see also *McNary* v. *Haitian Refugee Center, Inc.,* 498 U. S. 479, 498 (1991); *Webster* v. *Doe,* 486 U. S. 592, 603 (1988); *Johnson* v. *Robison,* 415 U. S. 361, 373–374 (1974).

mentions our authority to entertain original habeas petitions," and the statute "makes no mention of our authority to hear habeas petitions filed as original matters in this Court").[10] Implications from statutory text or legislative history are not sufficient to repeal habeas jurisdiction; instead, Congress must articulate specific and unambiguous statutory directives to effect a repeal. *Ex parte Yerger*, 8 Wall., at 105 ("Repeals by implication are not favored. They are seldom admitted except on the ground of repugnancy; and never, we think, when the former act can stand together with the new act").[11]

In this case, the plain statement rule draws additional reinforcement from other canons of statutory construction. First, as a general matter, when a particular interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result. See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988). Second, if an otherwise acceptable construction of a statute

---

[10] "In traditionally sensitive areas, . . . the requirement of [a] clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *Gregory* v. *Ashcroft*, 501 U. S. 452, 461 (1991) (internal quotation marks and citations omitted); see *United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 33 (1992) ("Waivers of the [Federal] Government's sovereign immunity, to be effective, must be 'unequivocally expressed'"); *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 242 (1985) ("Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute"); see also Eskridge & Frickey, Quasi-Constitutional Law: Clear Statement Rules as Constitutional Lawmaking, 45 Vand. L. Rev. 593, 597 (1992) ("[T]he Court . . . has tended to create the strongest clear statement rules to confine Congress's power in areas in which Congress has the constitutional power to do virtually anything").

[11] Cf. *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 1018 (1984) ("[W]here two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective" (internal quotation marks omitted)).

would raise serious constitutional problems, and where an alternative interpretation of the statute is "fairly possible," see *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932), we are obligated to construe the statute to avoid such problems. See *Ashwander* v. *TVA*, 297 U. S. 288, 341, 345–348 (1936) (Brandeis, J., concurring); *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U. S. 366, 408 (1909).[12]

A construction of the amendments at issue that would entirely preclude review of a pure question of law by any court would give rise to substantial constitutional questions. Article I, § 9, cl. 2, of the Constitution provides: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Because of that Clause, some "judicial intervention in deportation cases" is unquestionably "required by the Constitution." *Heikkila* v. *Barber*, 345 U. S. 229, 235 (1953).

Unlike the provisions of AEDPA that we construed in *Felker* v. *Turpin*, 518 U. S. 651 (1996), this case involves an alien subject to a federal removal order rather than a person confined pursuant to a state-court conviction. Accordingly, regardless of whether the protection of the Suspension

---

[12] "As was stated in *Hooper* v. *California*, 155 U. S. 648, 657 (1895), '[t]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.' This approach . . . also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it." *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council*, 485 U. S. 568, 575 (1988) (citing *Grenada County Supervisors* v. *Brogden*, 112 U. S. 261, 269 (1884)); see also *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 499–501, 504 (1979); *Murray* v. *Schooner Charming Betsy*, 2 Cranch 64, 118 (1804); *Machinists* v. *Street*, 367 U. S. 740, 749–750 (1961); *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932); *Lucas* v. *Alexander*, 279 U. S. 573, 577 (1929); *Panama R. Co.* v. *Johnson*, 264 U. S. 375, 390 (1924); *Delaware & Hudson Co.*, 213 U. S., at 407–408; *Parsons* v. *Bedford*, 3 Pet. 433, 448–449 (1830) (Story, J.).

Clause encompasses all cases covered by the 1867 Amendment extending the protection of the writ to state prisoners, cf. *id.*, at 663–664, or by subsequent legal developments, see *LaGuerre* v. *Reno,* 164 F. 3d 1035 (CA7 1998), at the absolute minimum, the Suspension Clause protects the writ "as it existed in 1789." [13]   *Felker,* 518 U. S., at 663–664.

At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest.[14]   See, *e. g., Swain* v. *Pressley,* 430 U. S. 372, 380, n. 13 (1977); *id.,* at 385–386 (Burger, C. J., concurring) (noting that "the traditional Great Writ was largely a remedy against executive detention"); *Brown* v. *Allen,* 344 U. S. 443, 533 (1953) (Jackson, J., concurring in result) ("The historic purpose of the writ has been to relieve detention by executive authorities without judicial trial").   In England prior to 1789, in the Colonies,[15] and in this Nation during the formative years of our Government, the writ of habeas corpus was available to nonenemy aliens as well as to citi-

---

[13] The fact that this Court would be required to answer the difficult question of what the Suspension Clause protects is in and of itself a reason to avoid answering the constitutional questions that would be raised by concluding that review was barred entirely.   Cf. Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 980 (1998) (noting that "reconstructing habeas corpus law . . . [for purposes of a Suspension Clause analysis] would be a difficult enterprise, given fragmentary documentation, state-by-state disuniformity, and uncertainty about how state practices should be transferred to new national institutions").

[14] At common law, "[w]hile habeas review of a court judgment was limited to the issue of the sentencing court's jurisdictional competency, an attack on an executive order could raise all issues relating to the legality of the detention."   Note, Developments in the Law—Federal Habeas Corpus, 83 Harv. L. Rev. 1038, 1238 (1970).

[15] See W. Duker, A Constitutional History of Habeas Corpus 115 (1980) (noting that "the common-law writ of habeas corpus was in operation in all thirteen of the British colonies that rebelled in 1776").

zens.[16] It enabled them to challenge Executive and private detention in civil cases as well as criminal.[17] Moreover, the issuance of the writ was not limited to challenges to the jurisdiction of the custodian, but encompassed detentions based on errors of law, including the erroneous application or interpretation of statutes.[18] It was used to command the discharge of seamen who had a statutory exemption from impressment into the British Navy,[19] to emancipate slaves,[20] and to obtain the freedom of apprentices[21] and asylum inmates.[22] Most important, for our purposes, those early cases contain no suggestion that habeas relief in cases in-

---

[16] See *Sommersett* v. *Stewart*, 20 How. St. Tr. 1, 79–82 (K. B. 1772); *Case of the Hottentot Venus*, 13 East 195, 104 Eng. Rep. 344 (K. B. 1810); *King* v. *Schiever*, 2 Burr. 765, 97 Eng. Rep. 551 (K. B. 1759); *United States* v. *Villato*, 28 F. Cas. 377 (No. 16,622) (CC Pa. 1797); *Commonwealth* v. *Holloway*, 1 Serg. & Rawle 392 (Pa. 1815); *Ex parte D'Olivera*, 7 F. Cas. 853 (No. 3,967) (CC Mass. 1813); see also Brief for Legal Historians as *Amici Curiae* 10–11; Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev., at 990–1004.

[17] See *King* v. *Nathan*, 2 Strange 880, 93 Eng. Rep. 914 (K. B. 1724); *Ex parte Boggin*, 13 East 549, 104 Eng. Rep. 484 (K. B. 1811); *Hollingshead's Case*, 1 Salkeld 351, 91 Eng. Rep. 307 (K. B. 1702); *Dr. Groenvelt's Case*, 1 Ld. Raym. 213, 91 Eng. Rep. 1038 (K. B. 1702); *Bushell's Case*, Vaughan 135, 124 Eng. Rep. 1006 (C. P. 1670); *Ex parte Randolph*, 20 F. Cas. 242 (No. 11,558) (CC Va. 1833) (Marshall, C. J., on circuit); *Ex parte D'Olivera*, 7 F. Cas. 853 (No. 3,967) (CC Mass. 1813); *Respublica* v. *Keppele*, 2 Dall. 197 (Pa. 1793).

[18] See, *e. g.*, *Hollingshead's Case*, 1 Salkeld 351, 91 Eng. Rep. 307 (K. B. 1702); *King* v. *Nathan*, 2 Strange 880, 93 Eng. Rep. 914 (K. B. 1724); *United States* v. *Bainbridge*, 24 F. Cas. 946 (No. 14,497) (CC Mass. 1816); *Ex parte Randolph*, 20 F. Cas. 242 (No. 11,558) (CC Va. 1833) (Marshall, C. J., on circuit); see also Brief for Legal Historians as *Amici Curiae* 3–10 (collecting cases).

[19] See, *e. g.*, the case of *King* v. *White* (1746) quoted in the addendum to *Sommersett* v. *Stewart*, 20 How. St. Tr., at 1376.

[20] *Id.*, at 79–82.

[21] *King* v. *Delaval*, 3 Burr. 1434, 97 Eng. Rep. 913 (K. B. 1763).

[22] *King* v. *Turlington*, 2 Burr. 1115, 97 Eng. Rep. 741 (K. B. 1761).

volving Executive detention was only available for constitutional error.[23]

Notwithstanding the historical use of habeas corpus to remedy unlawful Executive action, the INS argues that this case falls outside the traditional scope of the writ at common law. It acknowledges that the writ protected an individual who was held without legal authority, but argues that the writ would not issue where "an official had statutory authorization to detain the individual . . . but . . . the official was not properly exercising his discretionary power to determine whether the individual should be released." Brief for Respondent in *Colcano-Martinez v. INS*, O. T. 2000, No. 00–1011, p. 33. In this case, the INS points out, there is no dispute that the INS had authority in law to hold St. Cyr, as he is eligible for removal. St. Cyr counters that there is historical evidence of the writ issuing to redress the

---

[23] See, *e. g., Ex parte Boggin*, 13 East 549, n. (b), 104 Eng. Rep. 484, n. (a)[2] (K. B. 1811) (referring to *Chalacombe's Case*, in which the court required a response from the Admiralty in a case involving the impressment of a master of a coal vessel, despite the argument that exemptions for "seafaring persons of this description" were given only as a matter of "grace and favour," not "of right"); *Hollingshead's Case*, 1 Salkeld 351, 91 Eng. Rep. 307 (K. B. 1702) (granting relief on the grounds that the language of the warrant of commitment—authorizing detention until *"otherwise discharged by due course of law"*—exceeded the authority granted under the statute to commit "till [the bankrupt] submit himself to be examined by the commissioners"); see also Brief for Legal Historians as *Amici Curiae* 8–10, 18–28.

The dissent, however, relies on *Chalacombe's Case* as its sole support for the proposition that courts treated Executive discretion as "lying entirely beyond the judicial ken." See *post*, at 343 (opinion of SCALIA, J.). Although Lord Ellenborough expressed "some hesitation" as to whether the case should "stand over for the consideration of the Admiralty," he concluded that, given the public importance of the question, the response should be called for. 13 East, at 549, n. (b), 104 Eng. Rep., at 484, n. (a)[2]. The case ultimately became moot when the Admiralty discharged Chalacombe, but it is significant that, despite some initial hesitation, the court decided to proceed.

improper exercise of official discretion. See n. 23, *supra;* Hafetz, The Untold Story of Noncriminal Habeas Corpus and the 1996 Immigration Acts, 107 Yale L. J. 2509 (1998).

St. Cyr's constitutional position also finds some support in our prior immigration cases. In *Heikkila* v. *Barber,* the Court observed that the then-existing statutory immigration scheme "had the effect of precluding judicial intervention in deportation cases *except insofar as it was required by the Constitution,*" 345 U. S., at 234–235 (emphasis added)—and that scheme, as discussed below, did allow for review on habeas of questions of law concerning an alien's eligibility for discretionary relief. Therefore, while the INS' historical arguments are not insubstantial, the ambiguities in the scope of the exercise of the writ at common law identified by St. Cyr, and the suggestions in this Court's prior decisions as to the extent to which habeas review could be limited consistent with the Constitution, convince us that the Suspension Clause questions that would be presented by the INS' reading of the immigration statutes before us are difficult and significant.[24]

In sum, even assuming that the Suspension Clause protects only the writ as it existed in 1789, there is substantial

---

[24] The dissent reads into Chief Justice Marshall's opinion in *Ex parte Bollman,* 4 Cranch 75 (1807), support for a proposition that the Chief Justice did not endorse, either explicitly or implicitly. See *post,* at 339–340 (opinion of SCALIA, J.). He did note that "the first congress of the United States" acted under "the immediate influence" of the injunction provided by the Suspension Clause when it gave "life and activity" to "this great constitutional privilege" in the Judiciary Act of 1789, and that the writ could not be suspended until after the statute was enacted. 4 Cranch, at 95. That statement, however, surely does not imply that Marshall believed the Framers had drafted a Clause that would proscribe a temporary abrogation of the writ, while permitting its permanent suspension. Indeed, Marshall's comment expresses the far more sensible view that the Clause was intended to preclude any possibility that "the privilege itself would be lost" by either the inaction or the action of Congress. See, *e. g., ibid.* (noting that the Founders "must have felt, with peculiar force, the obligation" imposed by the Suspension Clause).

evidence to support the proposition that pure questions of law like the one raised by the respondent in this case could have been answered in 1789 by a common-law judge with power to issue the writ of habeas corpus. It necessarily follows that a serious Suspension Clause issue would be presented if we were to accept the INS' submission that the 1996 statutes have withdrawn that power from federal judges and provided no adequate substitute for its exercise. See Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv. L. Rev. 1362, 1395–1397 (1953). The necessity of resolving such a serious and difficult constitutional issue—and the desirability of avoiding that necessity—simply reinforce the reasons for requiring a clear and unambiguous statement of congressional intent.

Moreover, to conclude that the writ is no longer available in this context would represent a departure from historical practice in immigration law. The writ of habeas corpus has always been available to review the legality of Executive detention. See *Felker,* 518 U. S., at 663; *Swain* v. *Pressley,* 430 U. S., at 380, n. 13; *id.,* at 385–386 (Burger, C. J., concurring); *Brown* v. *Allen,* 344 U. S., at 533 (Jackson, J., concurring in result). Federal courts have been authorized to issue writs of habeas corpus since the enactment of the Judiciary Act of 1789, and § 2241 of the Judicial Code provides that federal judges may grant the writ of habeas corpus on the application of a prisoner held "in custody in violation of the Constitution or laws or treaties of the United States." [25] 28 U. S. C. § 2241. Before and after the enactment in 1875 of the first statute regulating immigration, 18 Stat. 477, that jurisdiction was regularly invoked on behalf of noncitizens, particularly in the immigration context. See, *e. g., In re*

---

[25] In fact, § 2241 descends directly from § 14 of the Judiciary Act of 1789 and the 1867 Act. See Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat. 82; Act of Feb. 5, 1867, ch. 28, 14 Stat. 385. Its text remained undisturbed by either AEDPA or IIRIRA.

*Kaine,* 14 How. 103 (1853); *United States* v. *Jung Ah Lung,* 124 U. S. 621, 626–632 (1888).

Until the enactment of the 1952 Immigration and Nationality Act, the sole means by which an alien could test the legality of his or her deportation order was by bringing a habeas corpus action in district court.[26]  See, *e. g., United States* v. *Jung Ah Lung,* 124 U. S. 621 (1888); *Heikkila,* 345 U. S., at 235; *Chin Yow* v. *United States,* 208 U. S. 8 (1908); *Ng Fung Ho* v. *White,* 259 U. S. 276, 284 (1922).  In such cases, other than the question whether there was some evidence to support the order,[27] the courts generally did not review factual determinations made by the Executive.  See *Ekiu* v. *United States,* 142 U. S. 651, 659 (1892).  However, they did review the Executive's legal determinations.  See *Gegiow* v. *Uhl,* 239 U. S. 3, 9 (1915) ("The statute by enumerating the conditions upon which the allowance to land may be denied, prohibits the denial in other cases.  And when the record shows that a commissioner of immigration is exceeding his power, the alien may demand his release upon *habeas corpus*"); see also Neuman, Jurisdiction and the Rule of Law after the 1996 Immigration Act, 113 Harv. L. Rev. 1963, 1965–1969 (2000).[28] In case after case, courts answered questions of law in ha-

---

[26] After 1952, judicial review of deportation orders could also be obtained by declaratory judgment actions brought in federal district court. *Shaughnessy* v. *Pedreiro,* 349 U. S. 48 (1955).  However, in 1961, Congress acted to consolidate review in the courts of appeals.  See *Foti* v. *INS,* 375 U. S. 217 (1963).

[27] See, *e. g., United States ex rel. Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103, 106 (1927) (holding that deportation "on charges unsupported by any evidence is a denial of due process which may be corrected on *habeas corpus*").

[28] "And when the record shows that a commissioner of immigration is exceeding his power, the alien may demand his release upon *habeas corpus.*  The conclusiveness of the decisions of immigration officers under § 25 is conclusiveness upon matters of fact.  This was implied in *Nishimura Ekiu* v. *United States,* 142 U. S. 651, relied on by the Government." *Gegiow* v. *Uhl,* 239 U. S. 3, 9 (1915).

beas corpus proceedings brought by aliens challenging Executive interpretations of the immigration laws.[29]

Habeas courts also regularly answered questions of law that arose in the context of discretionary relief. See, *e. g.*, *United States ex rel. Accardi* v. *Shaughnessy*, 347 U. S. 260 (1954); *United States ex rel. Hintopoulos* v. *Shaughnessy*, 353 U. S. 72, 77 (1957).[30] Traditionally, courts recognized a distinction between eligibility for discretionary relief, on the one hand, and the favorable exercise of discretion, on the other hand. See Neuman, 113 Harv. L. Rev., at 1991 (noting the "strong tradition in habeas corpus law . . . that subjects the legally erroneous failure to exercise discretion, unlike a substantively unwise exercise of discretion, to inquiry on the writ"). Eligibility that was "governed by spe-

---

[29] See, *e. g.*, *Delgadillo* v. *Carmichael*, 332 U. S. 388, 391 (1947) (rejecting on habeas the Government's interpretation of the statutory term "entry"); *Bridges* v. *Wixon*, 326 U. S. 135, 149 (1945) (rejecting on habeas the Government's interpretation of the term "affiliation" with the Communist Party); *Kessler* v. *Strecker*, 307 U. S. 22, 35 (1939) (holding that "as the Secretary erred in the construction of the statute, the writ must be granted"). Cf. *Mahler* v. *Eby*, 264 U. S. 32, 46 (1924) (reviewing on habeas the question whether the absence of an explicit factual finding that the aliens were "undesirable" invalidated the warrant of deportation).

[30] Indeed, under the pre-1952 regime which provided only what *Heikkila* termed the constitutional minimum of review, on habeas lower federal courts routinely reviewed decisions under the Seventh Proviso, the statutory predecessor to §212(c), to ensure the lawful exercise of discretion. See, *e. g.*, *United States ex rel. Devenuto* v. *Curran*, 299 F. 206 (CA2 1924); *Hee Fuk Yuen* v. *White*, 273 F. 10 (CA9 1921); *United States ex rel. Patti* v. *Curran*, 22 F. 2d 314 (SDNY 1926); *Gabriel* v. *Johnson*, 29 F. 2d 347 (CA1 1928). During the same period, habeas was also used to review legal questions that arose in the context of the Government's exercise of other forms of discretionary relief under the 1917 Act. See, *e. g.*, *United States ex rel. Adel* v. *Shaughnessy*, 183 F. 2d 371 (CA2 1950); *United States ex rel. Kaloudis* v. *Shaughnessy*, 180 F. 2d 489 (CA2 1950); *Mastrapasqua* v. *Shaughnessy*, 180 F. 2d 999 (CA2 1950); *United States ex rel. de Sousa* v. *Day*, 22 F. 2d 472 (CA2 1927); *Gonzalez-Martinez* v. *Landon*, 203 F. 2d 196 (CA9 1953); *United States ex rel. Berman* v. *Curran*, 13 F. 2d 96 (CA3 1926).

cific statutory standards" provided "a right to a ruling on an applicant's eligibility," even though the actual granting of relief was "not a matter of right under any circumstances, but rather is in all cases a matter of grace." *Jay* v. *Boyd*, 351 U. S. 345, 353–354 (1956). Thus, even though the actual suspension of deportation authorized by § 19(c) of the Immigration Act of 1917 was a matter of grace, in *United States ex rel. Accardi* v. *Shaughnessy*, 347 U. S. 260 (1954), we held that a deportable alien had a right to challenge the Executive's failure to exercise the discretion authorized by the law. The exercise of the District Court's habeas corpus jurisdiction to answer a pure question of law in this case is entirely consistent with the exercise of such jurisdiction in *Accardi*. See also *United States ex rel. Hintopoulos* v. *Shaughnessy*, 353 U. S., at 77.

Thus, under the pre-1996 statutory scheme—and consistent with its common-law antecedents—it is clear that St. Cyr could have brought his challenge to the BIA's legal determination in a habeas corpus petition under 28 U. S. C. § 2241. The INS argues, however, that AEDPA and IIRIRA contain four provisions that express a clear and unambiguous statement of Congress' intent to bar petitions brought under § 2241, despite the fact that none of them mention that section. The first of those provisions is AEDPA's § 401(e).

While the title of § 401(e)—"ELIMINATION OF CUSTODY REVIEW BY HABEAS CORPUS"—would seem to support the INS' submission, the actual text of that provision does not.[31] As we have previously noted, a title alone is not controlling. *Pennsylvania Dept. of Corrections* v. *Yeskey*, 524 U. S. 206,

---

[31] The section reads as follows:

"(e) ELIMINATION OF CUSTODY REVIEW BY HABEAS CORPUS.—Section 106(a) of the Immigration and Nationality Act (8 U. S. C. 1105a(a)) is amended—

"(1) in paragraph (8), by adding 'and' at the end;

"(2) in paragraph (9), by striking '; and' at the end and inserting a period; and

"(3) by striking paragraph (10)." 110 Stat. 1268.

212 (1998) ("'[T]he title of a statute . . . cannot limit the plain meaning of the text. For interpretive purposes, [it is] of use only when [it] shed[s] light on some ambiguous word or phrase'" (quoting *Trainmen* v. *Baltimore & Ohio R. Co.*, 331 U. S. 519, 528–529 (1947))). The actual text of § 401(e), unlike its title, merely repeals a subsection of the 1961 statute amending the judicial review provisions of the 1952 Immigration and Nationality Act. See n. 31, *supra.* Neither the title nor the text makes any mention of 28 U. S. C. § 2241.

Under the 1952 Act, district courts had broad authority to grant declaratory and injunctive relief in immigration cases, including orders adjudicating deportability and those denying suspensions of deportability. See *Foti* v. *INS*, 375 U. S. 217, 225–226 (1963). The 1961 Act withdrew that jurisdiction from the district courts and provided that the procedures set forth in the Hobbs Act would be the "sole and exclusive procedure" for judicial review of final orders of deportation, subject to a series of exceptions. See 75 Stat. 651. The last of those exceptions stated that "any alien held in custody pursuant to an order of deportation may obtain review thereof by habeas corpus proceedings." See *id.,* at 652, codified at 8 U. S. C. § 1105a(10) (repealed Sept. 30, 1996).

The INS argues that the inclusion of that exception in the 1961 Act indicates that Congress must have believed that it would otherwise have withdrawn the pre-existing habeas corpus jurisdiction in deportation cases, and that, as a result, the repeal of that exception in AEDPA in 1996 implicitly achieved that result. It seems to us, however, that the 1961 exception is best explained as merely confirming the limited scope of the new review procedures. In fact, the 1961 House Report provides that this section "in no way disturbs the Habeas Corpus Act."[32]   H. R. Rep. No. 1086, 87th Cong., 1st

---

[32] Moreover, the focus of the 1961 amendments appears to have been the elimination of Administrative Procedure Act (APA) suits that were brought in the district court and that sought declaratory relief. See, *e. g.,*

Sess., 29 (1961). Moreover, a number of the courts that considered the interplay between the general habeas provision and INA § 106(a)(10) after the 1961 Act and before the enactment of AEDPA did not read the 1961 Act's specific habeas provision as supplanting jurisdiction under § 2241. *Orozco v. INS*, 911 F. 2d 539, 541 (CA11 1990); *United States ex rel. Marcello v. INS*, 634 F. 2d 964, 967 (CA5 1981); *Sotelo Mondragon v. Ilchert*, 653 F. 2d 1254, 1255 (CA9 1980).

In any case, whether § 106(a)(10) served as an independent grant of habeas jurisdiction or simply as an acknowledgment of continued jurisdiction pursuant to § 2241, its repeal cannot be sufficient to eliminate what it did not originally grant— namely, habeas jurisdiction pursuant to 28 U. S. C. § 2241.[33] See *Ex parte Yerger*, 8 Wall., at 105–106 (concluding that the repeal of "an additional grant of jurisdiction" does not "operate as a repeal of jurisdiction theretofore allowed"); *Ex parte McCardle*, 7 Wall. 506, 515 (1869) (concluding that the repeal of portions of the 1867 statute conferring appellate jurisdiction on the Supreme Court in habeas proceedings did "not affect the jurisdiction which was previously exercised").

The INS also relies on three provisions of IIRIRA, now codified at 8 U. S. C. §§ 1252(a)(1), 1252(a)(2)(C), and

---

H. R. No. 2478, 85th Cong., 2d Sess., 9 (1958) ("[H]abeas corpus is a far more expeditious judicial remedy than that of declaratory judgment"); 104 Cong. Rec. 17173 (1958) (statement of Rep. Walter) (stating that courts would be "relieved of a great burden" once declaratory actions were eliminated and noting that habeas corpus was an "expeditious" means of review).

[33] As the INS acknowledges, the overwhelming majority of Courts of Appeals concluded that district courts retained habeas jurisdiction under § 2241 after AEDPA. See *Goncalves v. Reno*, 144 F. 3d 110 (CA1 1998); *Henderson v. INS*, 157 F. 3d 106 (CA2 1998); *Sandoval v. Reno*, 166 F. 3d 225 (CA3 1999); *Bowrin v. INS*, 194 F. 3d 483 (CA4 1999); *Requena-Rodriguez v. Pasquarell*, 190 F. 3d 299 (CA5 1999); *Pak v. Reno*, 196 F. 3d 666 (CA6 1999); *Shah v. Reno*, 184 F. 3d 719 (CA8 1999); *Magana-Pizano v. INS*, 200 F. 3d 603 (CA9 1999); *Jurado-Gutierrez v. Greene*, 190 F. 3d 1135 (CA10 1999); *Mayers v. INS*, 175 F. 3d 1289 (CA11 1999). But see *LaGuerre v. Reno*, 164 F. 3d 1035 (CA7 1998).

1252(b)(9) (1994 ed., Supp. V). As amended by § 306 of IIRIRA, 8 U. S. C. § 1252(a)(1) (1994 ed., Supp. V) now provides that, with certain exceptions, including those set out in subsection (b) of the same statutory provision, "[j]udicial review of a final order of removal . . . is governed only by" the Hobbs Act's procedures for review of agency orders in the courts of appeals. Similarly, § 1252(b)(9), which addresses the "[c]onsolidation of questions for judicial review," provides that "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section."[34] Finally, § 1252(a)(2)(C), which concerns "[m]atters not subject to judicial review," states: "Notwithstanding any other provision of law, no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" certain enumerated criminal offenses.

The term "judicial review" or "jurisdiction to review" is the focus of each of these three provisions. In the immigration context, "judicial review" and "habeas corpus" have historically distinct meanings. See *Heikkila* v. *Barber*, 345 U. S. 229 (1953). In *Heikkila*, the Court concluded that the finality provisions at issue "preclud[ed] judicial review" to the maximum extent possible under the Constitution, and thus concluded that the APA was inapplicable. *Id.*, at 235. Nevertheless, the Court reaffirmed the right to habeas

---

[34] Title 8 U. S. C. § 1252(g) (1994 ed., Supp. V), entitled "Exclusive jurisdiction," is not relevant to our analysis of the jurisdictional issue. In *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471 (1999) *(AADC)*, we explained that that provision applied only to three types of discretionary decisions by the Attorney General—specifically, to commence proceedings, to adjudicate cases, or to execute removal orders—none of which are at issue here.

corpus. *Ibid.* Noting that the limited role played by the courts in habeas corpus proceedings was far narrower than the judicial review authorized by the APA, the Court concluded that "it is the scope of inquiry on habeas corpus that differentiates" habeas review from "judicial review." *Id.*, at 236; see also, *e. g., Terlinden* v. *Ames*, 184 U. S. 270, 278 (1902) (noting that under the extradition statute then in effect there was "no right of review to be exercised by any court or judicial officer," but that limited review on habeas was nevertheless available); *Ekiu*, 142 U. S., at 663 (observing that while a decision to exclude an alien was subject to inquiry on habeas, it could not be "impeached or reviewed"). Both §§ 1252(a)(1) and (a)(2)(C) speak of "judicial review"— that is, full, nonhabeas review. Neither explicitly mentions habeas,[35] or 28 U. S. C. § 2241.[36] Accordingly, neither pro-

---

[35] Contrary to the dissent, see *post*, at 330 (opinion of SCALIA, J.), we do not think, given the longstanding distinction between "judicial review" and "habeas," that § 1252(e)(2)'s mention of habeas in the subsection governing "[j]udicial review of orders under section 1225(b)(1)" is sufficient to establish that Congress intended to abrogate the historical distinction between two terms of art in the immigration context when enacting IIRIRA.

"[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them." *Morissette* v. *United States*, 342 U. S. 246, 263 (1952).

At most, § 1252(e)(2) introduces additional statutory ambiguity, but ambiguity does not help the INS in this case. As we noted above, only the clearest statement of congressional intent will support the INS' position. See *supra*, at 305.

[36] It is worth noting that in enacting the provisions of AEDPA and IIRIRA that restricted or altered judicial review, Congress did refer specifically to several different sources of jurisdiction. See, *e. g.*, § 381, 110 Stat. 3009–650 (adding to grant of jurisdiction under 8 U. S. C. § 1329 (1994 ed., Supp. V) a provision barring jurisdiction under that provision

vision speaks with sufficient clarity to bar jurisdiction pursuant to the general habeas statute.

The INS also makes a separate argument based on 8 U. S. C. § 1252(b)(9) (1994 ed., Supp. V). We have previously described § 1252(b)(9) as a "zipper clause." *AADC*, 525 U. S. 471, 483 (1999). Its purpose is to consolidate "judicial review" of immigration proceedings into one action in the court of appeals, but it applies only "[w]ith respect to review of an order of removal under subsection (a)(1)." 8 U. S. C. § 1252(b) (1994 ed., Supp. V).[37] Accordingly, this provision, by its own terms, does not bar habeas jurisdiction over removal orders *not* subject to judicial review under § 1252(a)(1)—including orders against aliens who are removable by reason of having committed one or more criminal offenses. Subsection (b)(9) simply provides for the consolidation of issues to be brought in petitions for "[j]udicial review," which, as we note above, is a term historically dis-

---

for suits against the United States or its officers or agents). Section 401(e), which eliminated supplemental habeas jurisdiction under the INA, expressly strikes paragraph 10 of § 106(a) of the INA, *not* 28 U. S. C. § 2241. Similarly, § 306 of IIRIRA, which enacted the new INA § 242, specifically precludes reliance on the provisions of the APA providing for the taking of additional evidence, and imposes specific limits on the availability of declaratory relief. See, *e. g.*, 8 U. S. C. § 1535(e)(2) (1994 ed., Supp. V) (explicitly barring aliens detained under "alien terrorist removal" procedures from seeking "judicial review, including application for a writ of habeas corpus, except for a claim by the alien that continued detention violates the alien's rights under the Constitution"). At no point, however, does IIRIRA make express reference to § 2241. Given the historic use of § 2241 jurisdiction as a means of reviewing deportation and exclusion orders, Congress' failure to refer specifically to § 2241 is particularly significant. Cf. *Chisom* v. *Roemer*, 501 U. S. 380, 396, n. 23 (1991).

[37] As we noted in *AADC*, courts construed the 1961 amendments as channeling review of final orders to the courts of appeals, but still permitting district courts to exercise their traditional jurisdiction over claims that were viewed as being outside of a "final order." 525 U. S., at 485. Read in light of this history, § 1252(b)(9) ensures that review of those types of claims will now be consolidated in a petition for review and considered by the courts of appeals.

tinct from habeas. See *Mahadeo* v. *Reno*, 226 F. 3d 3, 12 (CA1 2000); *Flores-Miramontes* v. *INS*, 212 F. 3d 1133, 1140 (CA9 2000). It follows that § 1252(b)(9) does not clearly apply to actions brought pursuant to the general habeas statute, and thus cannot repeal that statute either in part or in whole.

If it were clear that the question of law could be answered in another judicial forum, it might be permissible to accept the INS' reading of § 1252. But the absence of such a forum, coupled with the lack of a clear, unambiguous, and express statement of congressional intent to preclude judicial consideration on habeas of such an important question of law, strongly counsels against adopting a construction that would raise serious constitutional questions.[38] Cf. *Felker*, 518 U. S., at 660–661. Accordingly, we conclude that habeas jurisdiction under § 2241 was not repealed by AEDPA and IIRIRA.

## III

The absence of a clearly expressed statement of congressional intent also pervades our review of the merits of St. Cyr's claim. Two important legal consequences ensued from respondent's entry of a guilty plea in March 1996: (1) He became subject to deportation, and (2) he became eligible for a discretionary waiver of that deportation under the pre-

---

[38] The dissent argues that our decision will afford more rights to criminal aliens than to noncriminal aliens. However, as we have noted, the scope of review on habeas is considerably more limited than on APA-style review. Moreover, this case raises only a pure question of law as to respondent's statutory eligibility for discretionary relief, not, as the dissent suggests, an objection to the manner in which discretion was exercised. As to the question of timing and congruent means of review, we note that Congress could, without raising any constitutional questions, provide an adequate substitute through the courts of appeals. See, e. g., *Swain* v. *Pressley*, 430 U. S. 372, 381 (1977) ("[T]he substitution of a collateral remedy which is neither inadequate nor ineffective to test the legality of a person's detention" does not violate the Suspension Clause).

vailing interpretation of §212(c). When IIRIRA went into effect in April 1997, the first consequence was unchanged except for the fact that the term "removal" was substituted for "deportation." The issue that remains to be resolved is whether IIRIRA §304(b) changed the second consequence by eliminating respondent's eligibility for a waiver.

The INS submits that the statute resolves the issue because it unambiguously communicates Congress' intent to apply the provisions of IIRIRA's Title III–A to all removals initiated after the effective date of the statute, and, in any event, its provisions only operate prospectively and not retrospectively. The Court of Appeals, relying primarily on the analysis in our opinion in *Landgraf* v. *USI Film Products,* 511 U. S. 244 (1994), held, contrary to the INS' arguments, that Congress' intentions concerning the application of the "Cancellation of Removal" procedure are ambiguous and that the statute imposes an impermissible retroactive effect on aliens who, in reliance on the possibility of §212(c) relief, pleaded guilty to aggravated felonies. See 229 F. 3d, at 416, 420. We agree.

Retroactive statutes raise special concerns. See *Landgraf,* 511 U. S., at 266. "The Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals."[39] *Ibid.* Accordingly, "congressional enactments . . . will not be construed to have retroactive effect unless their language requires this

[39] The INS appears skeptical of the notion that immigrants might be considered an "'unpopular group.'" See Brief for Petitioner 15, n. 8. But see Legomsky, Fear and Loathing in Congress and the Courts: Immigration and Judicial Review, 78 Texas L. Rev. 1615, 1626 (2000) (observing that, because noncitizens cannot vote, they are particularly vulnerable to adverse legislation).

result." *Bowen* v. *Georgetown Univ. Hospital,* 488 U. S. 204, 208 (1988).

> "[This] presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the 'principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal.' *Kaiser,* 494 U. S., at 855 (SCALIA, J., concurring). In a free, dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions." *Landgraf,* 511 U. S., at 265–266 (footnote omitted).

Despite the dangers inherent in retroactive legislation, it is beyond dispute that, within constitutional limits, Congress has the power to enact laws with retrospective effect. See *id.,* at 268. A statute may not be applied retroactively, however, absent a clear indication from Congress that it intended such a result. "Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *Id.,* at 272–273. Accordingly, the first step in determining whether a statute has an impermissible retroactive effect is to ascertain whether Congress has directed with the requisite clarity that the law be applied retrospectively. *Martin* v. *Hadix,* 527 U. S. 343, 352 (1999).

The standard for finding such unambiguous direction is a demanding one. "[C]ases where this Court has found truly 'retroactive' effect adequately authorized by statute have

involved statutory language that was so clear that it could sustain only one interpretation." *Lindh* v. *Murphy*, 521 U. S. 320, 328, n. 4 (1997). The INS makes several arguments in favor of its position that IIRIRA achieves this high level of clarity.

First, the INS points to the comprehensive nature of IIRIRA's revision of federal immigration law. "Congress's comprehensive establishment of a new immigration framework," the INS argues, "shows its intent that, after a transition period, the provisions of the old law should no longer be applied at all." Brief for Petitioner 33–34. We rejected a similar argument, however, in *Landgraf*, a case that, like this one, involved Congress' comprehensive revision of an important federal statute. 511 U. S., at 260–261. By itself, the comprehensiveness of a congressional enactment says nothing about Congress' intentions with respect to the retroactivity of the enactment's individual provisions.[40]

The INS also points to the effective date for Title III–A as providing a clear statement of congressional intent to apply IIRIRA's repeal of § 212(c) retroactively. See IIRIRA § 309(a), 110 Stat. 3009–625. But the mere promulgation of an effective date for a statute does not provide sufficient assurance that Congress specifically considered the potential unfairness that retroactive application would produce. For that reason, a "statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date." *Landgraf*, 511 U. S., at 257.

The INS further argues that any ambiguity in Congress' intent is wiped away by the "saving provision" in IIRIRA § 309(c)(1), 110 Stat. 3009–625. Brief for Petitioner 34–36. That provision states that, for aliens whose exclusion or deportation proceedings began prior to the Title III–A effec-

---

[40] The INS' argument that refusing to apply § 304(b) retroactively creates an unrecognizable hybrid of old and new is, for the same reason, unconvincing.

tive date, "the amendments made by [Title III–A] shall not apply, and . . . the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments."[41] This rule, however, does not communicate with unmistakable clarity, Congress' intention to apply its repeal of §212(c) retroactively. Nothing in either §309(c)(1) or the statute's legislative history even discusses the effect of the statute on proceedings based on pre-IIRIRA convictions that are commenced *after* its effective date.[42] Section 309(c)(1) is best read as merely setting out the *procedural* rules to be applied to removal proceedings pending on the effective date of the statute. Because "[c]hanges in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity," *Landgraf,* 511 U. S., at 275, it was necessary for Congress to identify which set of procedures would apply in those circumstances. As the Conference Report expressly explained, "[§309(c)] provides for the transition to new *procedures* in the case of an alien already in exclusion or deportation proceedings on the effective date." H. R. Conf. Rep. No. 104–828, p. 222 (1996) (emphasis added).

Another reason for declining to accept the INS' invitation to read §309(c)(1) as dictating the temporal reach of IIRIRA §304(b) is provided by Congress' willingness, in other sections of IIRIRA, to indicate unambiguously its intention

---

[41] "(c) TRANSITION FOR ALIENS IN PROCEEDINGS.—

"(1) GENERAL RULE THAT NEW RULES DO NOT APPLY.—Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings as of the title III–A effective date—

"(A) the amendments made by this subtitle shall not apply, and

"(B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments." §309, 110 Stat. 3009–625.

[42] The INS' reliance, see Reply Brief for Petitioner 12, on *INS* v. *Aguirre-Aguirre,* 526 U. S. 415, 420 (1999), is beside the point because that decision simply observed that the new rules would not apply to a proceeding filed *before* IIRIRA's effective date.

to apply specific provisions retroactively. IIRIRA's amendment of the definition of "aggravated felony," for example, clearly states that it applies with respect to "conviction[s] . . . entered before, on, or after" the statute's enactment date. § 321(b).[43]  As the Court of Appeals noted, the fact that Con-

_____

[43] See also IIRIRA § 321(c) ("The amendments made by this section shall apply to actions taken on or after the date of the enactment of this Act, regardless of when the conviction occurred . . ."); § 322(c) ("The amendments made by subsection (a) shall apply to convictions and sentences entered before, on, or after the date of the enactment of this Act"); § 342(b) (the amendment adding incitement of terrorist activity as a ground for exclusion "shall apply to incitement regardless of when it occurs"); § 344(c) (the amendment adding false claims of U. S. citizenship as ground for removal "shall apply to representations made on or after the date" of enactment); § 347(c) (amendments rendering alien excludable or deportable any alien who votes unlawfully "shall apply to voting occurring before, on, or after the date" of enactment); § 348(b) (amendment providing for automatic denial of discretionary waiver from exclusion "shall be effective on the date of the enactment . . . and shall apply in the case of any alien who is in exclusion or deportation proceedings as of such date unless a final administrative order in such proceedings has been entered as of such date"); § 350(b) (amendment adding domestic violence and stalking as grounds for deportation "shall apply to convictions, or violations of court orders, occurring after the date" of enactment); § 351(c) (discussing deportation for smuggling and providing that amendments "shall apply to applications for waivers filed before, on, or after the date" of enactment); § 352(b) (amendments adding renouncement of citizenship to avoid taxation as a ground for exclusion "shall apply to individuals who renounce United States citizenship on and after the date" of enactment); § 380(c) (amendment imposing civil penalties on aliens for failure to depart "shall apply to actions occurring on or after" effective date); § 384(d)(2) (amendments adding penalties for disclosure of information shall apply to "offenses occurring on or after the date" of enactment); § 531(b) (public charge considerations as a ground for exclusion "shall apply to applications submitted on or after such date"); § 604(c) (new asylum provision "shall apply to applications for asylum filed on or after the first day of the first month beginning more than 180 days after the date" of enactment).  The INS argues that the Title III–B amendments containing such express temporal provisions are unrelated to the subject matter of § 304(b).  Brief for Petitioner 37–38.  But it is clear that provisions such as IIRIRA § 321(b), which addresses IIRIRA's redefinition of "aggravated

gress made some provisions of IIRIRA expressly applicable to prior convictions, but did not do so in regard to § 304(b), is an indication "that Congress did not definitively decide the issue of § 304's retroactive application to pre-enactment convictions." See 229 F. 3d, at 415. The "saving provision" is therefore no more significant than the specification of an effective date.

The presumption against retroactive application of ambiguous statutory provisions, buttressed by "the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien," *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 449 (1987), forecloses the conclusion that, in enacting § 304(b), "Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits."[44] *Landgraf,* 511 U. S., at 272–273. We therefore proceed to the second step of *Landgraf's* retroactivity analysis in order to determine whether depriving removable aliens of consideration for § 212(c) relief produces an impermissible retroactive effect for aliens who, like respondent, were convicted pursuant to a plea agreement at a time when their plea would not have rendered them ineligible for § 212(c) relief.[45]

---

felony," deal with subjects quite closely related to § 304(b)'s elimination of § 212(c) relief for aliens convicted of aggravated felonies.

[44] The legislative history is significant because, despite its comprehensive character, it contains no evidence that Congress specifically considered the question of the applicability of IIRIRA § 304(b) to pre-IIRIRA convictions. Cf. *Harrison* v. *PPG Industries, Inc.*, 446 U. S. 578, 602 (1980) (REHNQUIST, J., dissenting) ("'In a case where the construction of legislative language such as this makes so sweeping and so relatively unorthodox a change as that made here, I think judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night'"), cited in *Chisom* v. *Roemer*, 501 U. S., at 396, n. 23 (citing A. Doyle, Silver Blaze, in The Complete Sherlock Holmes 335 (1927)).

[45] The INS argues that we should extend deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), to the BIA's interpretation of IIRIRA as applying to all de-

"The inquiry into whether a statute operates retroactively demands a commonsense, functional judgment about 'whether the new provision attaches new legal consequences to events completed before its enactment.'" *Martin*, 527 U. S., at 357–358 (quoting *Landgraf*, 511 U. S., at 270). A statute has retroactive effect when it "'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past . . . .'"[46] *Id.*, at 269 (quoting *Society for Propagation of the Gospel* v. *Wheeler*, 22 F. Cas. 756, 767 (No. 13,156) (CC NH 1814) (Story, J.)). As we have repeatedly counseled, the judgment whether a particular statute acts retroactively "should be informed and guided by 'familiar considerations of fair notice, reasonable reliance, and settled expectations.'" *Martin*, 527 U. S., at 358 (quoting *Landgraf*, 511 U. S., at 270).

IIRIRA's elimination of any possibility of § 212(c) relief for people who entered into plea agreements with the expectation that they would be eligible for such relief clearly "'attaches a new disability, in respect to transactions or considerations already past.'" *Id.*, at 269. Plea agreements involve a *quid pro quo* between a criminal defendant and the government. See *Newton* v. *Rumery*, 480 U. S. 386,

---

portation proceedings initiated after IIRIRA's effective date. We only defer, however, to agency interpretations of statutes that, applying the normal "tools of statutory construction," are ambiguous. *Id.*, at 843, n. 9; *INS* v. *Cardoza-Fonseca*, 480 U. S., at 447–448. Because a statute that is ambiguous with respect to retroactive application is construed under our precedent to be unambiguously prospective, *Landgraf*, 511 U. S., at 264, there is, for *Chevron* purposes, no ambiguity in such a statute for an agency to resolve.

[46] As we noted in *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, 520 U. S. 939 (1997), this language by Justice Story "does not purport to define the outer limit of impermissible retroactivity." *Id.*, at 947. Instead, it simply describes several *"sufficient,"* as opposed to *"necessary,"* conditions for finding retroactivity. *Ibid.*

393, n. 3 (1987). In exchange for some perceived benefit, defendants waive several of their constitutional rights (including the right to a trial) and grant the government numerous "tangible benefits, such as promptly imposed punishment without the expenditure of prosecutorial resources."[47] *Ibid.* There can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions.[48] See *Magana-Pizano* v. *INS*, 200 F. 3d 603, 612 (CA9 1999) ("That an alien charged with a crime . . . would factor the immigration consequences of conviction in deciding whether to plead or proceed to trial is well-documented"); see also 3 Bender, Criminal Defense Techniques §§ 60A.01, 60A.02[2] (1999) ("'Preserving the client's right to remain in the United States may be more important to the client than any potential jail sentence'" (quoted in Brief for National Association of Criminal Defense Law-

---

[47] "If every criminal charge were subjected to a full-scale trial, the States and the Federal Government would need to multiply by many times the number of judges and court facilities." *Santobello* v. *New York*, 404 U. S. 257, 260 (1971).

[48] Many States, including Connecticut, the State in which respondent pleaded guilty, require that trial judges advise defendants that immigration consequences may result from accepting a plea agreement. See Cal. Penal Code Ann. § 1016.5 (West 1985); Conn. Gen. Stat. § 54–1j (2001); D. C. Code Ann. § 16–713 (1981–1997); Fla. Rule Crim. Proc. 3.172(c)(8) (1999); Ga. Code Ann. § 17–7–93 (1997); Haw. Rev. Stat. § 802E–2 (1993); Md. Rule 4–242 (2001); Mass. Gen. Laws § 278:29D (1996 Supp.); Minn. Rule Crim. Proc. 15.01 (2000); Mont. Code Ann. § 46–12–210 (1997); N. M. Rule Crim. Form 9–406 (2001); N. Y. Crim. Proc. Law § 220.50(7) (McKinney 2001 Cum. Supp. Pamphlet); N. C. Gen. Stat. § 15A–1022 (1999); Ohio Rev. Code Ann. § 2943.031 (1997); Ore. Rev. Stat. § 135.385 (1997); R. I. Gen. Laws § 12–12–22 (2000); Tex. Code Crim. Proc. Ann., Art. 26.13(a)(4) (Vernon 1989 and Supp. 2001); Wash. Rev. Code § 10.40.200 (1990); Wis. Stat. § 971.08 (1993–1994). And the American Bar Association's Standards for Criminal Justice provide that, if a defendant will face deportation as a result of a conviction, defense counsel "should fully advise the defendant of these consequences." 3 ABA Standards for Criminal Justice 14–3.2 Comment, 75 (2d ed. 1982).

yers et al. as *Amici Curiae* 13)). Given the frequency with which §212(c) relief was granted in the years leading up to AEDPA and IIRIRA,[49] preserving the possibility of such relief would have been one of the principal benefits sought by defendants deciding whether to accept a plea offer or instead to proceed to trial.[50]

The case of Charles Jideonwo, a petitioner in a parallel litigation in the Seventh Circuit, is instructive. Charged in 1994 with violating federal narcotics law, Jideonwo entered into extensive plea negotiations with the Government, the sole purpose of which was to ensure that "'he got less than five years to avoid what would have been a statutory bar on 212(c) relief.'" *Jideonwo* v. *INS*, 224 F. 3d 692, 699 (CA7 2000) (quoting the Immigration Judge's findings of fact). The potential for unfairness in the retroactive application of IIRIRA § 304(b) to people like Jideonwo and St. Cyr is significant and manifest. Relying upon settled practice, the advice of counsel, and perhaps even assurances in open court that the entry of the plea would not foreclose §212(c) relief, a great number of defendants in Jideonwo's and St. Cyr's position agreed to plead guilty.[51] Now that prosecutors have received the benefit of these plea agreements, agreements that were likely facilitated by the aliens' belief in their continued eligibility for § 212(c) relief, it would surely be contrary to "familiar considerations of fair notice, reasonable reliance, and settled expectations," *Landgraf*, 511 U. S.,

---

[49] See n. 5, *supra*.

[50] Even if the defendant were not initially aware of §212(c), competent defense counsel, following the advice of numerous practice guides, would have advised him concerning the provision's importance. See Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 6–8.

[51] Ninety percent of criminal convictions today are obtained by guilty plea. See U. S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Statistics, Section 5: Judicial Processing of Defendants, in United States Sentencing Commission, 1999 Sourcebook of Criminal Justice Statistics (2000) (Tables 5.30, 5.51).

at 270, to hold that IIRIRA's subsequent restrictions deprive them of any possibility of such relief.[52]

The INS argues that deportation proceedings (and the Attorney General's discretionary power to grant relief from deportation) are "inherently prospective" and that, as a result, application of the law of deportation can never have a retroactive effect. Such categorical arguments are not particularly helpful in undertaking *Landgraf*'s common-sense, functional retroactivity analysis. See *Martin*, 527 U. S., at 359. Moreover, although we have characterized deportation as "look[ing] prospectively to the respondent's right to remain in this country in the future," *INS* v. *Lopez-Mendoza*, 468 U. S. 1032, 1038 (1984), we have done so in order to reject the argument that deportation is punishment for past behavior and that deportation proceedings are therefore subject to the "various protections that apply in the context of a criminal trial." *Ibid.* As our cases make clear, the presumption against retroactivity applies far beyond the confines of the criminal law. See *Landgraf*, 511 U. S., at 272. And our mere statement that deportation is not punishment for past crimes does not mean that we cannot consider an alien's reasonable reliance on the continued availability of discretionary relief from deportation when deciding whether the elimination of such relief has a retroactive effect.[53]

---

[52] The significance of that reliance is obvious to those who have participated in the exercise of the discretion that was previously available to delegates of the Attorney General under § 212(c). See *In re Soriano*, 16 BIA Immig. Rptr. B1–227, B1–238 to B1–239 (1996) (Rosenberg, Board Member, concurring and dissenting) ("I find compelling policy and practical reasons to go beyond such a limited interpretation as the one the majority proposes in this case. All of these people, and no doubt many others, had settled expectations to which they conformed their conduct").

[53] We are equally unconvinced by the INS' comparison of the elimination of § 212(c) relief for people like St. Cyr with the Clayton Act's elimination of federal courts' power to enjoin peaceful labor actions. In *American Steel Foundries* v. *Tri-City Central Trades Council*, 257 U. S. 184 (1921), and *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 464 (1921),

Finally, the fact that § 212(c) relief is discretionary does not affect the propriety of our conclusion. There is a clear difference, for the purposes of retroactivity analysis, between facing possible deportation and facing certain deportation. Cf. *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, 520 U. S. 939, 949 (1997) (an increased likelihood of facing a *qui tam* action constitutes an impermissible retroactive effect for the defendant); *Lindsey* v. *Washington*, 301 U. S. 397, 401 (1937) ("Removal of the *possibility* of a sentence of less than fifteen years . . . operates to [defendants'] detriment" (emphasis added)). Prior to AEDPA and IIRIRA, aliens like St. Cyr had a significant likelihood of receiving § 212(c) relief.[54] Because respondent, and other aliens like him, almost certainly relied upon that likelihood in deciding whether to forgo their right to a trial, the elimination of any possibility of § 212(c) relief by IIRIRA has an obvious and severe retroactive effect.[55]

we applied the Clayton Act's limitations on injunctive relief to cases pending at the time of the statute's passage. But unlike the elimination of § 212(c) relief in this case, which depends upon an alien's decision to plead guilty to an "aggravated felony," the deprivation of the District Court's power to grant injunctive relief at issue in *Duplex Printing* did not in any way result from or depend on the past action of the party seeking the injunction. Thus, it could not plausibly have been argued that the Clayton Act attached a "'new disability, in respect to transactions or considerations already past.'" *Landgraf*, 511 U. S., at 269.

[54] See n. 5, *supra.*

[55] The INS cites several cases affirming Congress' power to retroactively unsettle such expectations in the immigration context. See Brief for Petitioner 40–41, and n. 21. But our recognition that Congress has the power to act retrospectively in the immigration context sheds no light on the question at issue at this stage of the *Landgraf* analysis: whether a particular statute in fact has such a retroactive effect. Moreover, our decision today is fully consistent with a recognition of Congress' power to act retrospectively. We simply assert, as we have consistently done in the past, that in legislating retroactively, Congress must make its intention plain.

Similarly, the fact that Congress has the power to alter the rights of resident aliens to remain in the United States is not determinative of the question whether a particular statute has a retroactive effect. See *Chew Heong* v. *United States*, 112 U. S. 536 (1884). Applying a statute barring

We find nothing in IIRIRA unmistakably indicating that Congress considered the question whether to apply its repeal of § 212(c) retroactively to such aliens. We therefore hold that § 212(c) relief remains available for aliens, like respondent, whose convictions were obtained through plea agreements and who, notwithstanding those convictions, would have been eligible for § 212(c) relief at the time of their plea under the law then in effect.

The judgment is affirmed.

*It is so ordered.*

JUSTICE O'CONNOR, dissenting.

I join Parts I and III of JUSTICE SCALIA's dissenting opinion in this case. I do not join Part II because I believe that, assuming, *arguendo*, that the Suspension Clause guarantees some minimum extent of habeas review, the right asserted by the alien in this case falls outside the scope of that review for the reasons explained by JUSTICE SCALIA in Part II–B of his dissenting opinion. The question whether the Suspension Clause assures habeas jurisdiction in this particular case properly is resolved on this ground alone, and there is no need to say more.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, and with whom JUSTICE O'CONNOR joins as to Parts I and III, dissenting.

The Court today finds ambiguity in the utterly clear language of a statute that forbids the district court (and all

---

Chinese nationals from reentering the country without a certificate prepared when they left to people who exited the country before the statute went into effect would have retroactively unsettled their reliance on the state of the law when they departed. See *id.*, at 559. So too, applying IIRIRA § 304(b) to aliens who pleaded guilty or *nolo contendere* to crimes on the understanding that, in so doing, they would retain the ability to seek discretionary § 212(c) relief would retroactively unsettle their reliance on the state of the law at the time of their plea agreement.

other courts) to entertain the claims of aliens such as respondent St. Cyr, who have been found deportable by reason of their criminal acts. It fabricates a superclear statement, "magic words" requirement for the congressional expression of such an intent, unjustified in law and unparalleled in any other area of our jurisprudence. And as the fruit of its labors, it brings forth a version of the statute that affords *criminal* aliens *more* opportunities for delay-inducing judicial review than are afforded to noncriminal aliens, or even than were afforded to criminal aliens prior to this legislation concededly designed to *expedite* their removal. Because it is clear that the law deprives us of jurisdiction to entertain this suit, I respectfully dissent.

## I

In categorical terms that admit of no exception, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 110 Stat. 3009–546, unambiguously repeals the application of 28 U. S. C. § 2241 (the general habeas corpus provision), and of all other provisions for judicial review, to deportation challenges brought by certain kinds of criminal aliens. This would have been readily apparent to the reader, had the Court at the outset of its opinion set forth the relevant provisions of IIRIRA and of its statutory predecessor, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214. I will begin by supplying that deficiency, and explaining IIRIRA's jurisdictional scheme. It begins with what we have called a channeling or "'zipper' clause," *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 483 (1999)— namely, 8 U. S. C. § 1252(b)(9) (1994 ed., Supp. V). This provision, entitled "Consolidation of questions for judicial review," provides as follows:

> "Judicial review of *all* questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from *any action taken*

*or proceeding brought to remove an alien* from the United States under this subchapter shall be available *only* in judicial review of a final order under this section." (Emphases added.)

In other words, *if* any review is available of any "questio[n] of law . . . arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter," it is available "only in judicial review of a final order under this section [§ 1252]." What kind of review does that section provide? That is set forth in § 1252(a)(1), which states:

> "Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to [the expedited-removal provisions for undocumented aliens arriving at the border found in] section 1225(b)(1) of this title) is governed only by chapter 158 of title 28 [the Hobbs Act], except as provided in subsection (b) of this section [which modifies some of the Hobbs Act provisions] and except that the court may not order the taking of additional evidence under section 2347(c) of [Title 28]."

In other words, *if* judicial review is available, it consists *only* of the modified Hobbs Act review specified in § 1252(a)(1).

In some cases (including, as it happens, the one before us), there can be no review at all, because IIRIRA categorically and unequivocally rules out judicial review of challenges to deportation brought by certain kinds of criminal aliens. Section 1252(a)(2)(C) provides:

> "Notwithstanding *any* other provision of law, *no court* shall have jurisdiction to review *any* final order of removal against an alien who is removable by reason of having committed [one or more enumerated] criminal offense[s] [including drug-trafficking offenses of the sort of which respondent had been convicted]." (Emphases added.)

Finally, the pre-IIRIRA antecedent to the foregoing provisions—AEDPA § 401(e)—and the statutory background against which that was enacted, confirm that § 2241 habeas review, in the district court or elsewhere, has been unequivocally repealed. In 1961, Congress amended the Immigration and Nationality Act of 1952 (INA), 66 Stat. 163, by directing that the procedure for Hobbs Act review in the courts of appeals "shall apply to, and shall be the *sole and exclusive procedure for,* the judicial review of all final orders of deportation" under the INA. 8 U. S. C. § 1105a(a) (repealed Sept. 30, 1996) (emphasis added). Like 8 U. S. C. § 1252(a)(2)(C) (1994 ed., Supp. V), this provision squarely prohibited § 2241 district-court habeas review. At the same time that it enacted this provision, however, the 1961 Congress enacted a specific exception: "any alien held in custody pursuant to an order of deportation may obtain judicial review thereof by habeas corpus proceedings," 8 U. S. C. § 1105a(a)(10) (1994 ed.). (This would of course have been surplusage had § 2241 habeas review not been covered by the "sole and exclusive procedure" provision.) Section 401(e) of AEDPA repealed this narrow exception, and there is no doubt what the repeal was thought to accomplish: the provision was entitled "ELIMINATION OF CUSTODY REVIEW BY HABEAS CORPUS." 110 Stat. 1268. It gave universal preclusive effect to the "sole and exclusive procedure" language of § 1105a(a). And it is this regime that IIRIRA has carried forward.

The Court's efforts to derive ambiguity from this utmost clarity are unconvincing. First, the Court argues that §§ 1252(a)(2)(C) and 1252(b)(9) are not as clear as one might think—that, even though they are sufficient to repeal the jurisdiction of the courts of appeals, see *Calcano-Martinez* v. *INS, post,* at 351–352,[1] they do not cover habeas jurisdiction in the district court, since, "[i]n the immigration context, 'judicial review' and 'habeas corpus' have historically dis-

---

[1] In the course of this opinion I shall refer to some of the Court's analysis in this companion case; the two opinions are intertwined.

tinct meanings," *ante,* at 311, 312, n. 35. Of course § 1252(a)(2)(C) does not even *use* the term "judicial review" (it says "jurisdiction to review")—but let us make believe it does. The Court's contention that in *this* statute it does not include habeas corpus is decisively refuted by the language of § 1252(e)(2), enacted along with §§ 1252(a)(2)(C) and 1252(b)(9): "*Judicial review* of any determination made under section 1225(b)(1) of this title [governing review of expedited removal orders against undocumented aliens arriving at the border] is available in *habeas corpus* proceedings . . . ." (Emphases added.) It is hard to imagine how Congress could have made it any clearer that, when it used the term "judicial review" in IIRIRA, it included judicial review through habeas corpus. Research into the "historical" usage of the term "judicial review" is thus quite beside the point.

But the Court is demonstrably wrong about that as well. Before IIRIRA was enacted, from 1961 to 1996, the governing immigration statutes unquestionably treated "judicial review" as encompassing review by habeas corpus. As discussed earlier, 8 U. S. C. § 1105a (1994 ed.) made Hobbs Act review "the sole and exclusive procedure for, the *judicial review* of all final orders of deportation" (emphasis added), but created (in subsection (a)(10)) a limited exception for habeas corpus review. Section 1105a was entitled "*Judicial review* of orders of deportation and exclusion" (emphasis added), and the exception for habeas corpus stated that "any alien held in custody pursuant to an order of deportation may obtain *judicial review* thereof by *habeas corpus* proceedings," § 1105a(a)(10) (emphases added). Apart from this prior statutory usage, many of our own immigration cases belie the Court's suggestion that the term "judicial review," when used in the immigration context, does not include review by habeas corpus. See, *e. g., United States* v. *Mendoza-Lopez,* 481 U. S. 828, 836–837 (1987) ("[A]ny alien held in custody pursuant to an order of deportation may ob-

tain *judicial review* of that order in a *habeas corpus* proceeding" (emphases added)); *Shaughnessy* v. *Pedreiro,* 349 U. S. 48, 52 (1955) ("Our holding is that there is a right of *judicial review* of deportation orders *other than by habeas corpus . . .*" (emphases added)); see also *id.,* at 49.

The *only* support the Court offers in support of the asserted "longstanding distinction between 'judicial review' and 'habeas,'" *ante,* at 312, n. 35, is language from a single opinion of this Court, *Heikkila* v. *Barber,* 345 U. S. 229 (1953).[2] There, we "differentiate[d]" "habeas corpus" from "judicial review *as that term is used in the Administrative Procedure Act.*" *Id.,* at 236 (emphasis added). But that simply asserts that habeas corpus review is different from ordinary APA review, which no one doubts. It does *not* assert that habeas corpus review is not judicial review *at all.* Nowhere does *Heikkila* make such an implausible contention.[3]

---

[2] The recent Circuit authorities cited by the Court, which postdate IIRIRA, see *Mahadeo* v. *Reno,* 226 F. 3d 3, 12 (CA1 2000); and *Flores-Miramontes* v. *INS,* 212 F. 3d 1133, 1140 (CA9 2000)), cited *ante,* at 314, hardly demonstrate any historical usage upon which IIRIRA was based. Anyway, these cases rely for their analysis upon a third Court of Appeals decision—*Sandoval* v. *Reno,* 166 F. 3d 225, 235 (CA3 1999)—which simply relies on the passage from *Heikkila* under discussion.

[3] The older, pre-1961 judicial interpretations relied upon by the Court, see *ante,* at 312, are similarly unavailing. *Ekiu* v. *United States,* 142 U. S. 651 (1892), never purported to distinguish "judicial review" from habeas, and the Court's attempt to extract such a distinction from the opinion is unpersuasive. *Ekiu* did state that the statute "prevent[ed] the question of an alien immigrant's right to land, when once decided adversely by an inspector, acting within the jurisdiction conferred upon him, from being *impeached or reviewed,*" *id.,* at 663 (emphasis added; italicized words quoted *ante,* at 312); but the clear implication was that the question whether the inspector was "acting within the jurisdiction conferred upon him" *was* reviewable. The distinction pertained, in short, to the *scope* of judicial review on habeas—not to whether judicial review was available. *Terlinden* v. *Ames,* 184 U. S. 270, 278 (1902), likewise drew no distinction between "judicial review" and habeas; it simply stated that the extradition statute "gives no right of review to be exercised by any court

The Court next contends that the zipper clause, § 1252(b)(9), "by its own terms, does not bar" § 2241 district-court habeas review of removal orders, *ante*, at 313, because the opening sentence of subsection (b) states that "[w]ith respect to review of an order of removal *under subsection (a)(1) of this section*, the following requirements apply . . . ." (Emphasis added.) But in the broad sense, § 1252(b)(9) *does* "apply" "to review of an order of removal under subsection (a)(1)," because it mandates that "review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter" must take place *in connection with* such review. This is "application" enough—and to insist that subsection (b)(9) be given effect only *within* the review of removal orders that takes place under subsection (a)(1), is to render it meaningless. Moreover, other of the numbered subparagraphs of subsection (b) make clear that the introductory sentence does not at all operate as a limitation upon what follows. Subsection (b)(7) specifies the procedure by which "a defendant in a criminal proceeding" charged with failing to depart after being ordered to do so may contest "the validity of [a removal] order" before trial; and subsection (b)(8) prescribes some of the prerogatives and responsibilities of the Attorney General and the alien after entry of a final removal order. These provisions have no effect if they must apply (even in the broad sense that subsection (b)(9) can be said to apply) "to review of an order of removal under subsection (a)(1)."

Unquestionably, unambiguously, and unmistakably, IIRIRA expressly supersedes § 2241's general provision for habeas jurisdiction. The Court asserts that *Felker* v. *Turpin*, 518 U. S. 651 (1996), and *Ex parte Yerger*, 8 Wall. 85

---

or judicial officer, and what cannot be done directly [under the extradition statute] cannot be done indirectly through the writ of *habeas corpus*." Far from saying that habeas is *not* a form of judicial review, it says that habeas *is* an *indirect* means of review.

(1869), reflect a "longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction," *ante,* at 298. They do no such thing. Those cases simply applied the general principle—not unique to habeas—that "[r]epeals by implication are not favored." *Felker, supra,* at 660; *Yerger, supra,* at 105. *Felker* held that a statute which by its terms prohibited only further review by this Court (or by an en banc court of appeals) of a court-of-appeals panel's " 'grant or denial of . . . authorization . . . to file a second or successive [habeas] application,' " 518 U. S., at 657 (quoting 28 U. S. C. § 2244(b)(3)(E) (1994 ed., Supp. II)), should not be read to imply the repeal of this Court's separate and distinct "authority [under 28 U. S. C. § 2241 and 28 U. S. C. § 2254 (1994 ed. and Supp. V)] to hear habeas petitions filed as original matters in this Court," 518 U. S., at 661. *Yerger* held that an 1868 Act that by its terms "repeal[ed] only so much of the act of 1867 as authorized appeals, or the exercise of appellate jurisdiction by this court," should be read to "reach no [further than] the act of 1867," and did not repeal by implication the appellate jurisdiction conferred by the Judiciary Act of 1789 and other pre-1867 enactments. 8 Wall., at 105. In the present case, unlike in *Felker* and *Yerger,* none of the statutory provisions relied upon—§ 1252(a)(2)(C), § 1252(b)(9), or 8 U. S. C. § 1105a(a) (1994 ed.)—requires us to imply from one statutory provision the repeal of another. All *by their terms* prohibit the judicial review at issue in this case.

The Court insists, however, that since "[n]either [§ 1252(a)(1) nor § 1252(a)(2)(C)] explicitly mentions habeas, or 28 U. S. C. § 2241," "neither provision speaks with sufficient clarity to bar jurisdiction pursuant to the general habeas statute." *Ante,* at 312–313. Even in those areas of our jurisprudence where we *have* adopted a "clear statement" rule (notably, the sovereign immunity cases to which the Court adverts, *ante,* at 299, n. 10), clear statement has never meant the kind of magic words demanded by the Court

today—explicit reference to habeas or to § 2241—rather than reference to "judicial review" in a statute that explicitly calls habeas corpus a form of judicial review. In *Gregory* v. *Ashcroft*, 501 U. S. 452, 467 (1991), we said:

> "This [the Court's clear-statement requirement] does not mean that the [Age Discrimination in Employment] Act must mention [state] judges explicitly, though it does not. Cf. *Dellmuth* v. *Muth,* 491 U. S. 223, 233 (1989) (SCALIA, J., concurring). Rather, it must be plain to anyone reading the Act that it covers judges."

In *Gregory,* as in *United States* v. *Nordic Village, Inc.,* 503 U. S. 30, 34–35 (1992), and *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 241, 246 (1985), we held that the clear-statement requirement was not met, not because there was no explicit reference to the Eleventh Amendment, but because the statutory intent to eliminate state sovereign immunity *was not clear.* For the reasons discussed above, the intent to eliminate habeas jurisdiction in the present case is entirely clear, and that is all that is required.

It has happened before—too frequently, alas—that courts have distorted plain statutory text in order to produce a "more sensible" result. The unique accomplishment of today's opinion is that the result it produces is as far removed from what is sensible as its statutory construction is from the language of the text. One would have to study our statute books for a long time to come up with a more unlikely disposition. By authorizing § 2241 habeas review in the district court but foreclosing review in the court of appeals, see *Calcano-Martinez, post,* at 351–352, the Court's interpretation routes all legal challenges to removal orders brought by criminal aliens to the district court, to be adjudicated under that court's § 2241 habeas authority, which specifies no time limits. After review by that court, criminal aliens will presumably have an appeal as of right to the court of appeals, and can then petition this Court for a writ of cer-

tiorari. In contrast, noncriminal aliens seeking to challenge their removal orders—for example, those charged with having been inadmissible at the time of entry, with having failed to maintain their nonimmigrant status, with having procured a visa through a marriage that was not bona fide, or with having become, within five years after the date of entry, a public charge, see 8 U. S. C. §§ 1227(a)(1)(A), (a)(1)(C), (a)(1)(G), (a)(5) (1994 ed., Supp. V)—will still presumably be required to proceed directly to the court of appeals by way of petition for review, under the restrictive modified Hobbs Act review provisions set forth in § 1252(a)(1), including the 30-day filing deadline, see § 1252(b)(1). In fact, prior to the enactment of IIRIRA, criminal aliens also had to follow this procedure for immediate modified Hobbs Act review in the court of appeals. See 8 U. S. C. § 1105a(a) (1994 ed.). The Court has therefore succeeded in perverting a statutory scheme designed to *expedite* the removal of criminal aliens into one that now affords them *more* opportunities for (and layers of) judicial review (and hence more opportunities for delay) than are afforded *non*-criminal aliens—and more than were afforded criminal aliens prior to the enactment of IIRIRA.[4] This outcome speaks for itself; no Congress ever imagined it.

To excuse the violence it does to the statutory text, the Court invokes the doctrine of constitutional doubt, which it asserts is raised by the Suspension Clause, U. S. Const., Art. I, § 9, cl. 2. This uses one distortion to justify another, transmogrifying a doctrine designed to maintain "a just re-

[4] The Court disputes this conclusion by observing that "the scope of review on habeas is considerably more limited than on APA-style review," *ante*, at 314, n. 38 (a statement, by the way, that confirms our contention that habeas is, along with the Administrative Procedure Act (APA), one form of judicial review). It is more limited, to be sure—but not "considerably more limited" in any respect that would disprove the fact that criminal aliens are much better off than others. In all the many cases that (like the present one) involve "question[s] of law," *ibid.*, the Court's statutory misconstruction gives criminal aliens a preferred position.

spect for the legislature," *Ex parte Randolph*, 20 F. Cas. 242, 254 (No. 11,558) (CC Va. 1833) (Marshall, C. J., on circuit), into a means of thwarting the clearly expressed intent of the legislature. The doctrine of constitutional doubt is meant to effectuate, not to subvert, congressional intent, by giving *ambiguous* provisions a meaning that will avoid constitutional peril, and that will conform with Congress's presumed intent not to enact measures of dubious validity. The condition precedent for application of the doctrine is that the statute can *reasonably be construed* to avoid the constitutional difficulty. See, *e. g., Miller* v. *French*, 530 U. S. 327, 341 (2000) (" 'We cannot press statutory construction "to the point of disingenuous evasion" even to avoid a constitutional question' " (quoting *United States* v. *Locke*, 471 U. S. 84, 96 (1985), in turn quoting *George Moore Ice Cream Co.* v. *Rose*, 289 U. S. 373, 379 (1933))); *Salinas* v. *United States*, 522 U. S. 52, 60 (1997) (quoting *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 57, n. 9 (1996)). It is a device for interpreting what the statute says—not for *ignoring* what the statute says in order to avoid the trouble of determining whether what it says is unconstitutional. For the reasons I have set forth above, it is crystal clear that the statute before us here bars criminal aliens from obtaining judicial review, including § 2241 district-court review, of their removal orders. It is therefore also crystal clear that the doctrine of constitutional doubt has no application.

In the remainder of this opinion I address the question the Court *should* have addressed: Whether these provisions of IIRIRA are unconstitutional.

## II

### A

The Suspension Clause of the Constitution, Art. I, § 9, cl. 2, provides as follows:

"The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

A straightforward reading of this text discloses that it does not guarantee any content to (or even the existence of) the writ of habeas corpus, but merely provides that the writ shall not (except in case of rebellion or invasion) be suspended. See R. Fallon, D. Meltzer, & D. Shapiro, Hart & Wechsler's The Federal Courts and the Federal System 1369 (4th ed. 1996) ("[T]he text [of the Suspension Clause] does not confer a right to habeas relief, but merely sets forth when the 'Privilege of the Writ' may be suspended"). Indeed, that was precisely the objection expressed by four of the state ratifying conventions—that the Constitution failed affirmatively to guarantee a right to habeas corpus. See Collings, Habeas Corpus for Convicts—Constitutional Right or Legislative Grace?, 40 Calif. L. Rev. 335, 340, and nn. 39–41 (1952) (citing 1 J. Elliott, Debates on the Federal Constitution 328 (2d ed. 1836) (New York); 3 *id.*, at 658 (Virginia); 4 *id.*, at 243 (North Carolina); 1 *id.*, at 334 (Rhode Island)).

To "suspend" the writ was not to fail to enact it, much less to refuse to accord it particular content. Noah Webster, in his American Dictionary of the English Language, defined it—with patriotic allusion to the constitutional text— as "[t]o cause to cease for a time from operation or effect; as, to *suspend* the habeas corpus act." Vol. 2, p. 86 (1828 ed.). See also N. Bailey, An Universal Etymological English Dictionary (1789) ("To Suspend [in *Law*] signifies a temporal stop of a man's right"); 2 S. Johnson, A Dictionary of the English Language 1958 (1773) ("to make to stop for a time"). This was a distinct abuse of majority power, and one that had manifested itself often in the Framers' experience: temporarily but entirely eliminating the "Privilege of the Writ" for a certain geographic area or areas, or for a certain class

or classes of individuals. Suspension Acts had been adopted (and many more proposed) both in this country and in England during the late 18th century, see B. Mian, American Habeas Corpus: Law, History, and Politics 109–127 (1984)—including a 7-month suspension by the Massachusetts Assembly during Shay's Rebellion in 1787, *id.*, at 117. Typical of the genre was the prescription by the Statute of 1794, 34 Geo. 3, c. 54, §2, that " '[an Act for preventing wrongous imprisonment, and against undue delays in trials], insofar as the same may be construed to relate to the cases of Treason and suspicion of Treason, be suspended [for one year] . . . .' " Mian, *supra*, at 110. See also 16 Annals of Cong. 44, 402–425 (1852) (recording the debate on a bill, reported to the House of Representatives from the Senate on January 26, 1807, and ultimately rejected, to "suspen[d], for and during the term of three months," "the privilege of the writ of *habeas corpus*" for "any person or persons, charged on oath with treason, misprision of treason," and other specified offenses arising out of the Aaron Burr conspiracy).

In the present case, of course, Congress has not temporarily withheld operation of the writ, but has permanently altered its content. That is, to be sure, an act subject to majoritarian abuse, as is Congress's framing (or its determination not to frame) a habeas statute in the first place. But that is not the majoritarian abuse against which the Suspension Clause was directed. It is no more irrational to guard against the common and well known "suspension" abuse, without guaranteeing any particular habeas right that enjoys immunity from suspension, than it is, in the Equal Protection Clause, to guard against unequal application of the laws, without guaranteeing any particular law which enjoys *that* protection. And it is no more acceptable for this Court to write a habeas law, in order that the Suspension Clause might have some effect, than it would be for this Court to write other laws, in order that the Equal Protection Clause might have some effect.

The Court cites many cases which it says establish that it is a "serious and difficult constitutional issue," *ante*, at 305, whether the Suspension Clause prohibits the elimination of habeas jurisdiction effected by IIRIRA. Every one of those cases, however, pertains not to the meaning of the Suspension Clause, but to the content of the habeas corpus provision of the United States Code, which is quite a different matter. The closest the Court can come is a statement in one of those cases to the effect that the Immigration Act of 1917 "had the effect of precluding judicial intervention in deportation cases except insofar as it was required by the Constitution," *Heikkila*, 345 U. S., at 234–235. That statement (1) was pure dictum, since the Court went on to hold that the judicial review of petitioner's deportation order was unavailable; (2) does not specify to *what* extent judicial review *was* "required by the Constitution," which could (as far as the Court's holding was concerned) be zero; and, most important of all, (3) does not refer to the Suspension Clause, so could well have had in mind the due process limitations upon the procedures for determining deportability that our later cases establish, see Part III, *infra*.

There is, however, another Supreme Court dictum that is unquestionably in point—an unusually authoritative one at that, since it was written by Chief Justice Marshall in 1807. It supports precisely the interpretation of the Suspension Clause I have set forth above. In *Ex parte Bollman*, 4 Cranch 75, one of the cases arising out of the Burr conspiracy, the issue presented was whether the Supreme Court had the power to issue a writ of habeas corpus for the release of two prisoners held for trial under warrant of the Circuit Court of the District of Columbia. Counsel for the detainees asserted not only statutory authority for issuance of the writ, but inherent power. See *id.*, at 77–93. The Court would have nothing to do with that, whether under Article III or any other provision. While acknowledging an inherent power of the courts "over their own officers, or

to protect themselves, and their members, from being disturbed in the exercise of their functions," Marshall says that "the power of taking cognizance of any question between individuals, or between the government and individuals,"

> "must be given by written law.
>
> "The inquiry, therefore, on this motion will be, whether by any statute compatible with the constitution of the United States, the power to award a writ of *habeas corpus*, in such a case as that of Erick Bollman and Samuel Swartwout, has been given to this court." *Id.*, at 94.

In the ensuing discussion of the Judiciary Act of 1789, the opinion specifically addresses the Suspension Clause—not invoking it as a source of habeas jurisdiction, but to the contrary pointing out that without *legislated* habeas jurisdiction the Suspension Clause would have no effect.

> "It may be worthy of remark, that this act was passed by the first congress of the United States, sitting under a constitution which had declared 'that the privilege of the writ of *habeas corpus* should not be suspended, unless when, in cases of rebellion or invasion, the public safety might require it.'
>
> "Acting under the immediate influence of this injunction, they must have felt, with peculiar force, the obligation of providing efficient means by which this great constitutional privilege should receive life and activity; for if the means be not in existence, the privilege itself would be lost, although no law for its suspension should be enacted. Under the impression of this obligation, they give to all the courts the power of awarding writs of *habeas corpus*." *Id.*, at 95.[5]

---

[5] The Court claims that I "rea[d] into Chief Justice Marshall's opinion in *Ex parte Bollman* . . . support for a proposition that the Chief Justice did not endorse, either explicitly or implicitly," *ante*, at 304, n. 24. Its support for this claim is a highly selective quotation from the opinion,

There is no more reason for us to believe, than there was for the Marshall Court to believe, that the Suspension Clause means anything other than what it says.

## B

Even if one were to assume that the Suspension Clause, despite its text and the Marshall Court's understanding, guarantees some constitutional minimum of habeas relief, that minimum would assuredly not embrace the rarified right asserted here: the right to judicial compulsion of the exercise of Executive *discretion* (which may be exercised favorably or unfavorably) regarding a prisoner's release. If one reads the Suspension Clause as a guarantee of habeas relief, the obvious question presented is: *What* habeas relief? There are only two alternatives, the first of which is too absurd to be seriously entertained. It could be contended that Congress "suspends" the writ whenever it eliminates *any* prior ground for the writ that it adopted. Thus, if Congress should ever (in the view of this Court) have authorized immediate habeas corpus—without the need to exhaust administrative remedies—for a person arrested as an illegal alien, Congress would *never* be able (in the light of sad experience) to revise that disposition. The Suspen-

---

see *ibid.* There is nothing "implici[t]" whatsoever about Chief Justice Marshall's categorical statement that "the power to award the writ [of habeas corpus] by any of the courts of the United States, must be given by written law," 4 Cranch, at 94. See also *ibid.,* quoted *supra,* at 340 ("[T]he power of taking cognizance of any question between individuals, or between the government and individuals . . . must be given by written law"). If, as the Court concedes, "the writ could not be suspended," *ante,* at 304, n. 24, within the meaning of the Suspension Clause until Congress affirmatively provided for habeas by statute, then surely Congress may subsequently alter what it had initially provided for, lest the Clause become a one-way ratchet, see *infra* this page and 342. The Court's position that a permanent repeal of habeas jurisdiction is unthinkable (and hence a violation of the Suspension Clause) is simply incompatible with its (and Marshall's) belief that a failure to confer habeas jurisdiction is *not* unthinkable.

sion Clause, in other words, would be a one-way ratchet that enshrines in the Constitution every grant of habeas jurisdiction. This is, as I say, too absurd to be contemplated, and I shall contemplate it no further.

The other alternative is that the Suspension Clause guarantees the common-law right of habeas corpus, as it was understood when the Constitution was ratified. There is no doubt whatever that this did not include the right to obtain discretionary release. The Court notes with apparent credulity respondent's contention "that there is historical evidence of the writ issuing to redress the improper exercise of official discretion," *ante*, at 303–304. The only framing-era or earlier cases it alludes to in support of that contention, see *ante*, at 303, n. 23, referred to *ante*, at 303–304, establish no such thing. In *Ex parte Boggin*, 13 East 549, 104 Eng. Rep. 484 (K. B. 1811), the court did not even bother calling for a response from the custodian, where the applicant failed to show that he was statutorily exempt from impressment under any statute then in force. In *Chalacombe's Case*, reported in a footnote in *Ex parte Boggin*, the court did "let the writ go"—*i. e.*, called for a response from the Admiralty to Chalacombe's petition—even though counsel for the Admiralty had argued that the Admiralty's general policy of not impressing "seafaring persons of [Chalacombe's] description" was "a matter of grace and favour, [and not] of right." But the court never decided that it had authority to grant the relief requested (since the Admiralty promptly discharged Chalacombe of its own accord); in fact, it expressed doubt whether it had that authority. See 13 East, at 550, n. (b), 104 Eng. Rep., at 484, n. (a)[2] (Lord Ellenborough, C. J.) ("[C]onsidering it merely as a question of discretion, is it not more fit that this should stand over for the consideration of the Admiralty, to whom the matter ought to be disclosed?"). And in *Hollingshead's Case*, 1 Salkeld 351, 91 Eng. Rep. 307 (K. B. 1702), the "warrant of commitment" issued by the "commissioners of bankrupt" was "held naught," since it au-

thorized the bankrupt's continued detention by the commissioners until "otherwise discharged by due course of law," whereas the statute authorized commitment only "till [the bankrupt] submit himself to be examined by the commissioners." (Emphasis deleted.) There is nothing pertaining to executive discretion here.

*All* the other framing-era or earlier cases cited in the Court's opinion—indeed, *all the later Supreme Court cases until United States ex rel. Accardi v. Shaughnessy*, 347 U. S. 260, *in 1954*—provide habeas relief from executive detention only when the custodian had no legal authority to detain. See 3 J. Story, Commentaries on the Constitution of the United States § 1333, p. 206 (1833) (the writ lies to ascertain whether a "sufficient ground of detention appears"). The fact is that, far from forming a traditional basis for issuance of the writ of habeas corpus, the whole "concept of 'discretion' was not well developed at common law," Hafetz, The Untold Story of Noncriminal Habeas Corpus and the 1996 Immigration Acts, 107 Yale L. J. 2509, 2534 (1998), quoted in Brief for Respondent in *Calcano-Martinez v. INS*, O. T. 2000, No. 00–1011, p. 37. An exhaustive search of cases antedating the Suspension Clause discloses few instances in which courts even discussed the concept of executive discretion; and on the rare occasions when they did, they simply confirmed what seems obvious from the paucity of such discussions—namely, that courts understood executive discretion as lying entirely beyond the judicial ken. See, *e. g., Chalacombe's Case, supra*, at 342. That is precisely what one would expect, since even the executive's evaluation of the *facts*—a duty that was a good deal *more* than discretionary—was not subject to review on habeas. Both in this country, until passage of the Habeas Corpus Act of 1867, and in England, the longstanding rule had been that the truth of the custodian's return *could not be controverted*. See, *e. g., Opinion on the Writ of Habeas Corpus*, Wilm. 77, 107, 97 Eng. Rep. 29, 43 (H. L. 1758); Note, Developments in

the Law—Federal Habeas Corpus, 83 Harv. L. Rev. 1038, 1113–1114, and nn. 9–11 (1970) (quoting Act of Feb. 5, 1867, ch. 28, § 1, 14 Stat. 385); Oaks, Legal History in the High Court—Habeas Corpus, 64 Mich. L. Rev. 451, 453 (1966). And, of course, going beyond inquiry into the legal authority of the executive to detain would have been utterly incompatible with the well-established limitation upon habeas relief for a convicted prisoner: "[O]nce a person had been convicted by a superior court of general jurisdiction, a court disposing of a habeas corpus petition could not go behind the conviction for any purpose other than to verify the formal jurisdiction of the committing court." *Id.*, at 468, quoted in *Swain* v. *Pressley*, 430 U. S. 372, 384–385 (1977) (Burger, C. J., concurring in part and concurring in judgment).

In sum, there is no authority whatever for the proposition that, at the time the Suspension Clause was ratified—or, for that matter, even for a century and a half thereafter—habeas corpus relief was available to compel the Executive's allegedly wrongful refusal to exercise discretion. The striking proof of that proposition is that when, in 1954, the Warren Court held that the Attorney General's alleged refusal to exercise his discretion under the Immigration Act of 1917 could be reviewed on habeas, see *United States ex rel. Accardi* v. *Shaughnessy*, *supra*, it did so without citation of *any* supporting authority, and over the dissent of Justice Jackson, joined by three other Justices, who wrote:

> "Of course, it may be thought that it would be better government if even executive acts of grace were subject to judicial review. But the process of the Court seems adapted only to the determination of legal rights, and here the decision is thrusting upon the courts the task of reviewing a discretionary and purely executive function. Habeas corpus, like the currency, can be debased by over-issue quite as certainly as by too niggardly use. We would . . . leave the responsibility for suspension or

execution of this deportation squarely on the Attorney General, where Congress has put it." *Id.*, at 271.

## III

Given the insubstantiality of the due process and Article III arguments against barring judicial review of respondent's claim (the Court does not even bother to mention them, and the Court of Appeals barely acknowledges them), I will address them only briefly.

The Due Process Clause does not "[r]equir[e] [j]udicial [d]etermination [o]f" respondent's claim, Brief for Petitioners in *Calcano-Martinez* v. *INS*, O. T. 2000, No. 00–1011, p. 34. Respondent has no legal entitlement to suspension of deportation, no matter how appealing his case. "[T]he Attorney General's suspension of deportation [is] "an act of grace" which is accorded pursuant to her 'unfettered discretion,' *Jay* v. *Boyd*, 351 U. S. 345, 354 (1956) . . . , and [can be likened, as Judge Learned Hand observed,] to "a judge's power to suspend the execution of a sentence, or the President's to pardon a convict," 351 U. S., at 354, n. 16 . . . ." *INS* v. *Yueh-Shaio Yang*, 519 U. S. 26, 30 (1996). The furthest our cases have gone in imposing due process requirements upon analogous exercises of Executive discretion is the following. (1) We have required *"minimal* procedural safeguards" for death-penalty clemency proceedings, to prevent them from becoming so capricious as to involve "a state official flipp[ing] a coin to determine whether to grant clemency," *Ohio Adult Parole Authority* v. *Woodard*, 523 U. S. 272, 289 (1998) (O'CONNOR, J., concurring in part and concurring in judgment). Even assuming that this holding is not part of our "death-is-different" jurisprudence, *Shafer* v. *South Carolina*, 532 U. S. 36, 55 (2001) (SCALIA, J., dissenting) (citation omitted), respondent here is not complaining about the absence of procedural safeguards; he disagrees with the Attorney General's judgment on a point of law. (2) We have recognized the existence of a due process liberty interest when

a State's statutory parole procedures prescribe that a prisoner "shall" be paroled if certain conditions are satisfied, see *Board of Pardons* v. *Allen,* 482 U. S. 369, 370–371, 381 (1987); *Greenholtz* v. *Inmates of Neb. Penal and Correctional Complex,* 442 U. S. 1, 12 (1979). There is no such statutory *entitlement* to suspension of deportation, no matter what the facts. Moreover, in neither *Woodard,* nor *Allen,* nor *Greenholtz* did we intimate that the Due Process Clause conferred jurisdiction of its own force, without benefit of statutory authorization. All three cases were brought under 42 U. S. C. § 1983.

Article III, § 1's investment of the "judicial Power of the United States" in the federal courts does not prevent Congress from committing the adjudication of respondent's legal claim wholly to "non-Article III federal adjudicative bodies," Brief for Petitioners in *Calcano-Martinez* v. *INS,* O. T. 2000, No. 00–1011, at 38. The notion that Article III requires every Executive determination, on a question of law or of fact, to be subject to judicial review has no support in our jurisprudence. Were it correct, the doctrine of sovereign immunity would not exist, and the APA's general permission of suits challenging administrative action, see 5 U. S. C. § 702, would have been superfluous. Of its own force, Article III does no more than commit to the courts matters that are "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789," *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.,* 458 U. S. 50, 90 (1982) (REHNQUIST, J., concurring in judgment)—which (as I have discussed earlier) did not include supervision of discretionary Executive action.

\* \* \*

The Court has created a version of IIRIRA that is not only unrecognizable to its framers (or to anyone who can read) but gives the statutory scheme precisely the *opposite* of its intended effect, affording criminal aliens *more* opportu-

nities for delay-inducing judicial review than others have, or even than criminal aliens had prior to the enactment of this legislation. Because §2241's exclusion of judicial review is unmistakably clear, and unquestionably constitutional, both this Court and the courts below were without power to entertain respondent's claims. I would set aside the judgment of the court below and remand with instructions to have the District Court dismiss for want of jurisdiction. I respectfully dissent from the judgment of the Court.